SMITH v ALLENDALE MUTUAL INSURANCE COMPANY

SABRAW v MICHIGAN MILLERS MUTUAL INSURANCE
COMPANY

BULLOCK v MICHIGAN MILLERS MUTUAL INSURANCE
COMPANY

CSUTORA v MICHIGAN MILLERS MUTUAL INSURANCE
COMPANY

HANSEN v MICHIGAN MILLERS MUTUAL INSURANCE
COMPANY

WAUGH v MICHIGAN MILLERS MUTUAL INSURANCE
COMPANY .

Docket Nos. 60645, 62465-62470. Argued December 3, 1979 (Calendar
Nos. 1, 2).—Decided March 30, 1981. Rehearing denied 411
Mich —.

Noble Smith, II, and Amelia R. Smith, his wife, brought an action
in Wayne Circuit Court against Allendale Mutual Insurance
Company and Factory Mutual Engineering Association for
damages for injuries sustained in Noble Smith's employment at
Great Lakes Steel Corporation. Smith was injured in escaping
from the cab of an overhead crane he was operating after an
electric cable broke and touched the cab, causing an arc which
burned a hole through the wall of the cab. Smith's theory was
that Allendale, which insured Great Lakes Steel against fire
damage to its property, and Factory Mutual, which periodically
inspected the property for fire hazards by agreement with
Allendale, had voluntarily undertaken to perform Great Lakes

REFERENCES FOR POINTS IN HEADNOTES

[1, 17, 20, 21, 26] 57 Am Jur 2d, Negligence §§ 37, 45.

[2, 3] 20 Am Jur 2d, Courts § 67.
  57 Am Jur 2d, Negligence § 42.

[4-6, 27] 57 Am Jur 2d, Negligence §§ 9, 34.

[7, 8, 11, 12, 14-16, 18, 19, 22-25, 28-31] 57 Am Jur 2d, Negligence
  §§ 43, 47, 158

[10] 57 Am Jur 2d, Negligence §§ 45, 47, 58.

[13] 15A Am Jur 2d, Common Law § 3.

[14, 16] 82 Am Jur 2d, Workmen's Compensation § 313.

[32] 57 Am Jur 2d, Negligence § 255.

Steel's duty to provide its employees with a safe place to work insofar as fire hazards were concerned, and that they had negligently breached that duty. The circuit court, Roland L. Olzark, J., granted a judgment for the defendants notwithstanding a verdict for the plaintiffs. The Court of Appeals, Maher, P.J., and N. J. Kaufman and Borchard, JJ., affirmed (Docket No. 29240). Plaintiffs appeal.

Alvia G. Sabraw, Helen J. Bullock, Michael Csutora, James Hansen and Pauline Hansen, and Donald Waugh brought actions against Michigan Millers Mutual Insurance Company for damages arising out of injuries and deaths of employees of Farm Bureau Services caused by an explosion at Farm Bureau's Zilwaukee feed mill. The plaintiffs' theory was that the defendant, which insured the feed mill against fire damage, had negligently performed voluntary inspections of the premises for fire hazards. The Saginaw Circuit Court, Joseph R. McDonald, J., granted judgments for the defendant notwithstanding verdicts for the plaintiffs. The Court of Appeals, R. B. Burns, P.J., and D. F. Walsh and Clements, JJ., reversed and ordered the verdicts reinstated (Docket Nos. 77-495—77-500). Defendant appeals.

In an opinion by Justice Levin, joined by Chief Justice Coleman and Justices Kavanagh, Fitzgerald, and Ryan, the Supreme Court *held:*

The plaintiffs' theory of liability in these cases is that the insurers negligently performed their undertakings to render services to their insureds, the employers, and that the negligent performance resulted in physical harm to third parties, the employees. However, the threshold requirement of an undertaking to render services to another is lacking in these cases. An insurer's inspection of an insured's premises for fire hazards does not in itself demonstrate an undertaking to render fire inspection and prevention services to the insured.

1. The plaintiffs do not claim that a statute or the common law imposes a duty on fire insurers to inspect for and warn of fire hazards for the benefit of the owners of the insured premises or their employees, customers, or other invitees, nor do they claim that the insurance contracts provided for inspections. Rather, they contend that the defendant insurers, by inspecting the premises, incurred a duty to the owners and to the plaintiffs as their employees to exercise reasonable care under the tort principles of the common law, expressed in the Restatement of Torts, dealing with liability to a third person for negligent performance of an undertaking. The application of a common-law rule to a particular set of facts does not turn upon whether those facts can be characterized in the language

of the Restatement section corresponding to the common-law rule. Unlike a statute, which expresses a legislative directive for the treatment of future cases, the Restatement seeks primarily to distill the teachings of decided cases and is descriptive. While its drafters may sometimes strive to choose "the better rule" or to predict or shape the development of the law, its influence depends upon its persuasiveness. Even where a particular section of the Restatement has received specific judicial endorsement, cases where that section is invoked must be decided by reference to the policies and precedents underlying the rule restated.

2. It is generally agreed that whether, upon the facts in evidence, a legal duty is imposed upon one party for the benefit of the other is to be decided by the court. The plaintiffs argue that where the scope and nature of the relations among the plaintiff, the defendant, and others determines whether a duty is owed, the question is one for the jury. The statement that a particular defendant owes a duty to a particular plaintiff, while commonplace and not incorrect, merges two distinct analytical steps. The jury decides the question of duty only in the sense that it determines whether the proofs establish the elements of a relationship which the court has already concluded gives rise to a duty as a matter of law. It is also for the court to determine what evidence is minimally necessary to establish the elements of a relationship on which tort liability may be premised. In these cases the evidence, taken most favorably to the plaintiffs, failed to create a question for the jury whether the scope and nature of the relationships gave rise to an undertaking which would create a duty on the part of the insurers. Absent evidence supporting a conclusion that the insurers agreed or intended to provide inspection services for the employers' benefit, the threshold element of duty which flows from an undertaking to render services to another is lacking.

3. The Restatement of the rule provides that one who undertakes to render services to another may in certain circumstances be liable to foreseeable third persons for negligence. The plaintiffs misconceive the sweep of the Restatement's principles. The illustrations given in the official comments to the Restatement and the cases cited in the Reporter's Notes involve either a contractual undertaking by a defendant to render particular services, an undertaking by an agent or employee to render services to his employer as part of the agency or employment, or an undertaking whose unambiguous object is to benefit another and which would not have been

performed primarily for the actor's purposes. One can agree with the general proposition that any person, including an insurer, who assumes to act must act with reasonable care without concluding that the insurers in these cases are subject to liability under the rule. It is not enough that the insurer acted. It must have undertaken to render services to another. Its acts do not constitute such an undertaking unless it agreed or intended to benefit the insured or its employees by the inspections.

4. Ordinarily the question whether an actor has undertaken to render services to another is not in dispute. In the present cases the central question is whether such an undertaking to serve another can be established from conduct which is consistent with an intention primarily to serve the purposes of the actor. The law does not impose a duty upon an insurer who inspects in the absence of conduct evidencing an agreement or intent to benefit others by the inspection; only in such a case has the insurer acknowledged the propriety of judging the competence of its inspection by a standard which measures its potential effect on others. The rule of the Restatement by its terms does not apply to an actor following a self-serving course of conduct. While an undertaking which may give rise to liability under the rule may be gratuitous as well as contractual, the evidence must show that the actor assumed an obligation or intended to render services for the benefit of another.

5. Evidence demonstrating merely that a benefit was conferred upon another is not sufficient to establish an undertaking. Where the actor's conduct is consistent with a primary purpose of the actor to benefit himself, the plaintiff must offer additional evidence to create a question for the jury whether there was an undertaking to render services and hence a legal duty to one who might foreseeably be injured by the actor's failure to perform the undertaking with reasonable care. An inspection for fire hazards does not in itself represent that the insurer has done more than seek to reduce claims or determine whether it is willing to underwrite or remain on the risk. Identification of fire hazards and the making of recommendations to the insured do not in themselves suggest an objective other than to reduce the insurer's losses on the policy or to justify a decision by the insurer to raise or lower rates or to decline or remain on the risk; such conduct does not imply an undertaking to warn the insured of all reasonably identifiable fire hazards. Absent a specific undertaking of such a duty, there must be other evidence to indicate that the insurer undertook to render fire inspection services for the insured's benefit.

6. The plaintiffs Smith argue that the evidence shows an

extensive and systematic undertaking by defendants Allendale and Factory Mutual to assist Great Lakes Steel Corporation in minimizing loss from fire. While the inspections benefited Great Lakes, it does not follow that defendants Allendale and Factory Mutual undertook to confer that benefit on Great Lakes. All the evidence relied upon by the plaintiffs to establish an undertaking is equally consistent with the view that the defendant insurer systematically attempted to reduce its losses under the fire insurance policy. There is no indication that the defendants agreed or intended to inspect the Great Lakes plant for other than the insurer's loss prevention and underwriting purposes, or even that Great Lakes thought that it was the purpose of the inspections to relieve Great Lakes of responsibility for detecting fire hazards and instituting remedial measures.

7. The plaintiffs in the *Michigan Millers* cases argue that the record establishes that the defendant insurer either completely assumed Farm Bureau's function of providing its employees with a safe place to work, or at least actively joined hands in a partnership with Farm Bureau in this respect. The plaintiffs acknowledge that the inspections are carried out, first and foremost, in order to reduce the losses to the insurer, but nevertheless equate the inspections with an undertaking to render services to another. The evidence in these cases establishes no undertaking to benefit the insured or its employees, although incidental benefits naturally flowed from the insurer's effort to protect itself. The insurance contract did not provide for inspections, and the forms on which the inspector's suggestions to Farm Bureau were written stated that the insurance company accepted "no responsibility for their completeness or effectiveness". An insurer is entirely justified in so limiting its liability under the circumstance that the law does not impose on a fire insurer a duty to inspect for and warn its insureds of fire hazards. There is no reported case in which a verdict against a fire insurer reached the appellate courts or which has considered in such a developed factual context the concerns here addressed.

8. The development of common-law principles is shaped by considerations of public policy. The Legislature has amended the Worker's Disability Compensation Act to preclude third-party actions against the insurance carrier based upon its furnishing of, or failure to furnish, safety inspections. The amendment expresses a policy judgment that the societal benefit obtained from not burdening with tort liability the insur-

er's decision to inspect its risks outweighs whatever advantage might be realized from insistence that such inspections be conducted with due care. Inspections by insurers can detect hazards before they manifest themselves in harm and thus reduce the social costs of property damage and injury. Even a negligent inspector may detect far more hazards than he misses. Imposition of liability upon insurers who conduct inspections, without regard to whether they have agreed to provide inspections as a service to their insureds, might either reduce inspections or raise premiums to meet the cost of more extensive inspection programs and judgments. If fire insurers were to become responsible to those on the premises should a jury decide that the injury was attributable to negligence in inspecting, for fire hazards, the premium heretofore based on the risk of property damage must necessarily be substantially enlarged to reflect such public liability exposure. Imposing such liability would not improve the safety of the premises unless the insured acts on insurers' recommendations. Unless all insurers require the insured to implement insurers' recommendations, many insureds will decline to do so, preferring to find a carrier willing to insure the risk even at a greater cost. Imposing such responsibilities on fire insurers has doubtful social utility in comparison to the aggregate cost of the disruption of established underwriting relationships, the additional premiums charged insureds by other sources for insuring the same risk theretofore insured but now declined, the litigation generated against fire insurers, the general increase in all premiums to cover the additional exposure of fire insurers attributable to the newly imposed public liability and marginal repairs ordered by an overly cautious inspector. As the records in these cases indicate, many employers will comply to a degree with insurers' recommendations. There is no basis for concluding that the additional degree of compliance obtainable by imposing enlarged responsibilities on fire insurers would justify the costs.

9. In assessing the wisdom of enlarging the tort liability of fire insurers, it is taken into account that an owner of premises owes a common-law duty of safe maintenance to persons on the premises unless, as in the case of an owner-employer in respect to his employees, a statute has relieved him of that responsibility, and that owners of premises of sufficient value so that fire insurers conduct inspections generally maintain public liability insurance within limits ordinarily adequate to compensate persons injured on the premises by unsafe conditions. It would not be an appropriate development of the law of torts to impose liability on a fire insurer on the facts presented. If liability

were to be imposed, it would be essentially to provide an alternative to workers' compensation for injured employees, and for customers and invitees where the insured failed to maintain adequate public liability insurance. But the cost of providing such additional protection would inevitably be passed on to employers in the form of increased fire insurance premiums, a result inconsistent with their limited liability under the Worker's Disability Compensation Act for injuries suffered by their employees.

10. Unless the insurer agrees or intends to provide the insured with fire inspection services and advice guarding against reasonably discoverable fire hazards, a negligent failure to detect and warn of such hazards in the course of an inspection is not actionable.

The judgment of the Court of Appeals is affirmed in *Smith,* and reversed in *Sabraw.*

Justice Moody, joined by Justice Williams, dissented. He wrote:

1. A line of cases dealing with the liability of an insurer for negligent inspection has developed the principle that an inspection clause in an insurance contract creates a contractual right of action for the insured if there is a negligent inspection of the insured property. Implicit in this principle is the fundamental notion that inspections inure to the benefit of both the insurer and the insured. A plaintiff who is not a party to the insurance contract also has a cause of action against the insurer who is negligent in performing its inspections, not in contract, but upon the principle of tort law that a party who voluntarily assumes an undertaking owes a duty to all foreseeable plaintiffs to perform that undertaking with reasonable care.

2. Courts in these cases have applied tort principles rather than contract principles and recognized that the duty to use due care arises separate from the insurance contract, without regard to any contractual obligation to inspect. The duty arose from the facts of the cases, including a long insurance relation between the plaintiff employer and the defendant insurer, periodic inspections by the insurer with reports to the employer, a history of inspections of the particular equipment which caused the damage, and the insurer's advertisements which specifically emphasized the value of the inspection services. At one time it was held that the claimant must have relied on the inspections, but later cases held that the claiming party need not show reliance on the inspections or that reliance could be an alternative ground for liability.

3. In rejecting the insurers' argument that their gratuitous

inspections were conducted only for purposes of assessing the risk, courts have relied on evidence that the insurer made regular and periodic inspections, with reports and recommendations to the insured, and that the insurer represented that the insured would receive extra safety benefits from the services of the insurer's experts. The insurer's lack of "control" over the activities or equipment of the insured or its employees does not relieve it of liability.

4. Reliance on the safety inspections, either by the insured or by its employees, is not an essential element in an action predicated upon the principle of the Restatement of liability for negligent performance of an undertaking. Liability of an insurer for the negligent performance of an undertaking, as distinguished from a failure to perform, is not limited to such persons as might have relied upon the insurer to act but extends to such persons as the insurer could reasonably have foreseen would be endangered as the result of negligent performance. If the plaintiffs are found to be foreseeable persons, *i.e.,* within the risk created by the negligent actions of the defendant, the plaintiffs have properly pleaded a cause of action.

5. It is unnecessary to consider the question of contractual liability where a cause of action is made out in tort. It is enough that there was an actual undertaking to perform the inspection, whether or not inspections were a promised inducement for the insurance contract, and that the inspection was done negligently. Liability applies to any undertaking to render services to another which the gratuitous actor should recognize as necessary for the protection of third parties. Whether the services which were gratuitously undertaken should have been recognized as necessary for the protection of foreseeable third parties is an issue properly submitted to the jury.

6. To maintain a cause of action for negligent inspection in these cases, the plaintiffs must show that the insurer undertook to render to the insured employers fire safety inspections which the insurers should have recognized as necessary for the protection of the insureds' employees, that the insurers did not exercise reasonable care in carrying out the inspections, that the insurers' negligent performance of the undertaking was the proximate or legal cause of the injuries or death for which recovery is sought, and that the employees suffered physical harm as a result of the concurrence of the first three elements of the tort. Under the facts of these cases, to show one of the grounds of liability set forth in the Restatement, that the insurers undertook to perform the duty owed by the employers to provide a workplace for their employees free from fire

hazards, is also necessarily to show that the insurers undertook to render services to the employers which they should recognize' as necessary for the protection of a third person.

7. Liability for negligence to foreseeable third persons may be imposed without an express undertaking between two parties to render services. The conduct of the parties may evidence an undertaking by the insurer to render services to another with its inspection, thus giving rise to a duty to exercise reasonable care in performing the inspection. Because each case is unique on its facts, the totality of evidence presented, rather than any particular fact, is crucial in evaluating the existence of duty, breach, proximate cause, and injury. In determining whether the plaintiff has a claim in tort, courts have looked to a number of factors, for example: the amount of inspecting done and some communication to the insured of the inspector's findings; the purpose of the inspection; whether the plaintiff belongs to the class of persons which the inspections were intended to protect; the scope of inspection; the extent to which the insurer has control over repairs; and reliance (which is not always necessary).

8. As a general proposition, whether the defendants owed a duty of care to the plaintiffs is for the court to decide. However, the existence of the facts establishing the conduct or relationship of the parties which imposes the duty, as well as the resolution of disputed inferences from the facts, are clearly questions for the jury. An initial element which must be found as a fact before a duty arises is an undertaking to render services to another. Where there is no evidence of the defendant's undertaking, e.g., where the insurer does not perform any safety inspections, the court may decide the question as a matter of law. Where the evidence exists but is equivocal, the issues of fact, and reasonable inferences including the resolution of any ambiguities, must be submitted to the jury. Therefore, in these cases the question was properly submitted to the jury and should not be decided as a matter of law by the Supreme Court. The verdicts should not be disturbed unless reasonable minds could not differ regarding them, and all evidence presented, findings of fact and legitimate inferences drawn from the facts are to be construed on appeal in favor of the plaintiffs in these cases.

9. In the Smith case the cause of action was based solely on an undertaking to perform a duty owed by the insured to a third person, and reliance is not an issue. The jury was justified in finding that Allendale, through its agent, Factory Mutual, undertook to perform the duty of Great Lakes Steel to provide

a safe workplace for its employees and the evidence also justified submission of the duty question to the jury. There was uncontroverted testimony that the Factory Mutual Engineering Association had conducted inspections of the Great Lakes Steel Corporation's property periodically for over 40 years. Factory Mutual held itself out to be one of the most pre-eminent fire inspection and protection companies, and Great Lakes Steel consistently complied with the changes recommended by Factory Mutual to minimize fire hazards. Factory Mutual was clearly aware that Great Lakes Steel relied on the inspections and the recommendations, which benefited the insured and its employees as well, and a proper inspection would most likely have provided a safer workplace. The plaintiffs properly established the element of duty. There was also sufficient evidence of breach and proximate cause. While Factory Mutual argued that the scope of its inspections did not extend to the ungrounded electrical system, there was evidence that it should have. Witnesses for Factory Mutual acknowledged that one industrial fire in five results from some fire in the electrical system but that the electrical system at Great Lakes Steel was never inspected. Although Factory Mutual did not control repairs made for safety reasons, Great Lakes Steel substantially complied with the many recommendations which were made by Factory Mutual. The plaintiffs in this case presented sufficient evidence for submission to the jury of the issues whether the inspection should have been extended to the electrical system, and whether an inspection conducted with reasonable care would have protected the plaintiff employee.

10. In the *Sabraw* cases the involvement of defendant Michigan Millers in the activities of its insured began before there was an insurance contract on the Zilwaukee feed mill, while the building was being constructed. The insurer's inspector made recommendations regarding the installation of electrical equipment and compliance with certain safety standards for fire and explosion protection. After the buildings were completed, the inspector continued inspecting the facilities and making recommendations for safety measures with which the insured most often complied. The defendant's inspector testified that his inspections were not merely for rate-making purposes but also to minimize the danger of loss or injury from fire and explosion and that his recommendations were made to promote fire safety and the employee's health. Given that evidence, the jury could have found an undertaking in spite of the clause on the inspection reports which attempted to limit Michigan Mill-

ers' liability for negligent inspection. The courts below correctly decided that the question whether the defendant knew or should have known of the dangerous use of a gasoline-engine industrial vehicle within the feed mill was one for the jury to decide. There was sufficient evidence from which a jury could conclude that there was a substantial likelihood that Farm Bureau would have ceased the use of the industrial vehicle within the mill had the risk of such use ever been reported to Farm Bureau. Evidence was presented from which the jury could conclude that defendant Michigan Millers' negligence in failing to discover and warn of the dangers of using the industrial vehicle was a sufficient factor in causing the plaintiff's harm to support the finding of liability under the Restatement.

11. There can be no question that there was evidence to support the findings of the jury in *Smith* and in *Sabraw* that the defendant insurers had gratuitously undertaken a duty to protect the employees of the insured from fire hazards and had breached that duty, causing injury and death to the employees.

12. Some courts have held that a party can limit its exposure to tort liability by express contract. However, there is an absence of such express limitation by contract in these cases. An insurer which has gratuitously undertaken to perform fire inspections and has performed them in a negligent fashion cannot claim that the scope of its inspection was limited to protecting against damage to property because the risk of damage from fire hazards extends not only to all foreseeably damaged property but also to all foreseeably injured persons.

13. The insurers argue that it would be contrary to public policy to allow actions against them for negligent inspections which are gratuitously undertaken. If they are subjected to such extensive liability, the insurers contend, they would either cease all safety inspection for economic reasons, or the inspections would be so careful that the cost of insurance would become prohibitively high. The first contention is speculative at best, and as to the second, requiring measures to save lives and avoid injuries is worth some potential increase in insurance costs. The policy of tort law favors redressing people for their injuries rather than allowing tortfeasors to avoid the consequences of their wrongs. The Legislature has protected workers' compensation carriers, but not property insurers, from tort liability for negligent performance of safety inspections. The Court should decline to do what the Legislature would not do.

79 Mich App 351; 261 NW2d 561 (1977) affirmed.
87 Mich App 568; 274 NW2d 838 (1978) reversed.

OPINION OF THE COURT

1. NEGLIGENCE — DUTY — THIRD PARTIES.

It is a principle of the common law that one who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if he has undertaken to perform a duty owed by the other to the third person.

2. COMMON LAW — RESTATEMENT — STATUTES.

The application of a common-law rule found in the Restatement of the Law to a particular set of facts does not turn upon whether those facts can be characterized in the language of the Restatement; unlike a statute, which expresses a legislative directive for the treatment of future cases, the Restatement seeks primarily to distill the teachings of decided cases and is descriptive.

3. COMMON LAW — RESTATEMENT.

The influence of the Restatement of the Law depends upon its persuasiveness, and even where a particular section of the Restatement has received specific judicial endorsement, cases where that section is invoked must be decided by reference to the policies and precedents underlying the rule restated; textual analysis of the Restatement is useful only to the extent that it illuminates these fundamental considerations.

4. NEGLIGENCE — DUTY — QUESTION OF LAW.

The question of duty, whether, upon the facts in evidence, such a relation exists between the parties that a legal obligation, or duty, will be imposed upon one for the benefit of the other, is a question to be decided by the court.

5. NEGLIGENCE — DUTY — QUESTION OF LAW — QUESTION OF FACT.

To say that a particular defendant owes a duty to a particular plaintiff requires two steps: it is for the court to determine, as a matter of law, what characteristics must be present for a relationship to give rise to a duty the breach of which may result in tort liability; it is for the jury to determine whether the facts in evidence establish the elements of a relationship

which the court has already concluded give rise to a duty as a matter of law.

6. Negligence — Duty — Evidence — Sufficiency.

What evidence is minimally necessary to establish the elements of a relationship on which tort liability may be premised is for the court to determine as a matter of law.

7. Negligence — Fire Insurers — Safety Inspections — Duty — Third Parties.

That any person, including a fire insurer, who assumes to act must act with reasonable care does not require the conclusion that a fire insurer who inspected an insured's premises for fire hazards is subject to liability to a third party for the consequences of negligently conducting the inspection; the cases in which liability to third parties for negligent performance of an undertaking to render services to another has been found involve a contractual undertaking by a defendant to render particular services, an undertaking by an employee to render services to his employer as part of the agency or employment, or an undertaking whose unambiguous object is to benefit another person and which would not have been performed primarily for the actor's purposes.

8. Negligence — Fire Insurers — Safety Inspections — Duty — Third Parties.

A fire insurer who inspects the insured's premises for fire hazards does not, merely by making the inspections, undertake to render services to the insured and thereby incur a duty, the negligent breach of which will support liability to an employee who might be foreseeably injured by the insurer's failure to use reasonable care to perform the inspections, absent evidence that the insurer agreed or intended to provide services for the benefit of the insured.

9. Negligence — Duty — Third Parties — Undertaking.

The common-law rule giving a right of action for negligence in favor of a third party if an actor breaches a duty created by his undertaking to render services to another person by its terms does not apply to an actor who merely follows a self-serving course of conduct.

10. Negligence — Duty — Third Parties — Undertaking — Evidence.

Where evidence of an actor's conduct is consistent with a primary purpose of the actor to benefit himself, the plaintiff third party bringing an action for negligence of the actor in performing an

alleged undertaking must offer additional evidence to create a question for the jury whether there was an undertaking to render services and hence a legal duty to a third party who might be foreseeably injured by the actor's failure to use reasonable care to perform the undertaking; evidence demonstrating merely that a benefit was conferred upon another does not suffice to show an undertaking.

11. NEGLIGENCE — FIRE INSURERS — SAFETY INSPECTIONS — DUTY.

An inspection by a fire insurer for fire hazards on an insured's premises, or identification of fire hazards and the making of safety recommendations to the insured, do not in themselves suggest an objective other than to reduce the insurer's losses on the policy, or to justify a decision by the insurer to raise or lower rates, or to decline or remain on the risk; such conduct does not imply an undertaking to warn the insured of reasonably identifiable fire hazards.

12. NEGLIGENCE — FIRE INSURERS — SAFETY INSPECTIONS — DUTY — LIMITATION OF LIABILITY.

A fire insurer may limit liability for the completeness or effectiveness of inspections of the insured's premises, under circumstances which might support an inference that the insurer had undertaken an obligation to inspect for and warn the insured of fire hazards, because the law does not impose on a fire insurer a duty to inspect for and warn the insured of fire hazards.

13. COMMON LAW — PUBLIC POLICY.

The development of common-law principles is shaped by considerations of public policy.

14. NEGLIGENCE — INSURERS — SAFETY INSPECTIONS — THIRD PARTIES — WORKERS' COMPENSATION.

The Legislature has amended the Worker's Disability Compensation Act to preclude third-party actions against the workers' compensation insurance carrier based upon its furnishing of, or failure to furnish, safety inspections; the amendment expresses a policy judgment which guides the Supreme Court in deciding whether it would be an appropriate development of the law of torts to impose liability for negligent safety inspections on a fire insurer for the benefit of third persons (employees, customers and other invitees of the insured) because even a negligent inspector may detect far more hazards than he misses (1972 PA 285).

15. NEGLIGENCE — FIRE INSURERS — SAFETY INSPECTIONS — DUTY — THIRD PARTIES.

It would not be an appropriate development of the law of torts to impose liability to third parties on a fire insurer for a negligent failure to detect and warn of fire hazards in the course of fire inspection services, unless the insurer agrees or intends to provide the insured with fire inspection services, because there is no basis for concluding that the additional degree of compliance with the inspectors' safety recommendations obtainable by imposing enlarged responsibilities on fire insurers would justify the aggregate cost of the disruption of established underwriting relationships, the additional premiums charged insureds by other sources for insuring the same risk previously insured but now declined, the litigation generated against fire insurers, the general increase in all premiums to cover the additional exposure of fire insurers attributable to the newly imposed public liability, and marginal repairs ordered by an overly cautious inspector.

16. NEGLIGENCE — FIRE INSURERS — SAFETY INSPECTIONS — THIRD PARTIES — WORKERS' COMPENSATION.

Application of principles of the law of torts to impose liability to third parties on a fire insurer for a negligent failure to detect and warn of fire hazards in the course of fire inspection services for the insured's premises would essentially provide an alternative to workers' compensation for injured employees and an alternative means of recovery to customers and invitees where the insured failed to maintain adequate limits of public liability insurance for its common-law duty of safe maintenance of the premises; but the cost of providing such additional protection to workers would inevitably be passed on to the employers by increased fire insurance premiums, a result inconsistent with their limited liability under the Worker's Disability Compensation Act for injuries suffered by their employees (MCL 418.101 *et seq.;* MSA 17.237[101] *et seq.).*

DISSENTING OPINION BY BLAIR MOODY, JR., J.

17. NEGLIGENCE — DUTY — THIRD PARTIES.

*One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if his failure to exercise reasonable care increases the risk of such harm, or he has undertaken to perform a duty owed by*

the other to the third person, or the harm is suffered because of reliance of the other or the third person upon the undertaking.

18. NEGLIGENCE — INSURERS — SAFETY INSPECTIONS — CONTRACTS.

An inspection clause in an insurance contract creates a contractual right of action for the insured if there is a negligent inspection of the insured property; implicit in this principle is the fundamental notion that inspections inure to the benefit of both the insurer and the insured.

19. NEGLIGENCE — INSURERS — SAFETY INSPECTIONS — DUTY — THIRD PARTIES.

A plaintiff who is not a party to a liability insurance contract has a cause of action against an insurer who has gratuitously undertaken to inspect the insured property and is negligent in performing the inspections; the action is based upon the principle of tort law that a party who assumes an undertaking owes a duty to all foreseeable plaintiffs to perform that undertaking with reasonable care.

20. NEGLIGENCE — DUTY — THIRD PARTIES.

Liability of a defendant for the negligent performance of a gratuitous undertaking to perform services for another, as distinguished from a failure to perform, is not limited to such persons as might have relied upon the defendant to act but extends to such persons as the defendant could reasonably have foreseen would be endangered as the result of negligent performance.

21. NEGLIGENCE — DUTY — THIRD PARTIES.

Every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act; the duty does not depend upon contract, privity of interest, or the proximity of relationship, but extends to remote and unknown persons.

22. NEGLIGENCE — INSURERS — SAFETY INSPECTIONS — DUTY — THIRD PARTIES.

Plaintiff employees properly pleaded a cause of action against the fire insurer of their employer for the insurer's negligence in inspections of the property of the employer which the insurer had gratuitously undertaken to perform where, had the property been properly inspected and an appropriate warning been given to the insured employer, it is highly unlikely that the plaintiffs' injuries would have resulted, and where the plaintiffs were foreseeable persons, i.e., within the risk created by the negligent actions of the defendant insurer.

23. NEGLIGENCE — INSURERS — SAFETY INSPECTIONS — DUTY.

   *To maintain an action in tort against an insurer who has gratu-
   itously undertaken to inspect insured property and is negligent
   in performing the inspections a third party must show that
   there were circumstances which created a duty of the defen-
   dant to the third party, that the insurer did not exercise
   reasonable care in carrying out the inspections undertaken,
   that the negligence proximately caused the third party's injury,
   and that the third party suffered physical injury as a result.*

24. NEGLIGENCE — INSURERS — INSPECTIONS — DUTY — EVIDENCE.

   *The conduct of the parties may evidence an undertaking by an
   insurer to render services to a third party with its inspection of
   the insured's property, thus giving rise to a duty to exercise
   reasonable care in performing the inspection so that liability to
   foreseeable third persons for negligence may be imposed with-
   out an express agreement between the insurer and the insured
   to render services.*

25. NEGLIGENCE — INSURERS — SAFETY INSPECTIONS — DUTY — THIRD
   PARTIES.

   *Whether an insurer assumed a duty toward the insured or third
   parties for inspection of the insured property so as to render
   the insurer liable for negligent inspection depends, e.g., on the
   amount of the inspecting done, the purpose of the inspection,
   whether the person injured was a member of the class which
   the inspection was intended to protect, whether the insurer
   inspected or should have inspected the exact cause of the
   injury, the extent to which the insurer participates in control-
   ling repairs, and, in some cases, whether there was reliance on
   the insurer's activities.*

26. NEGLIGENCE — INTENT — DUTY — THIRD PARTIES.

   *Tort law, for reasons of policy, often imposes a duty without
   regard to the defendant's intent; the fact that the primary
   purpose of the defendant's acts is for his own benefit does not
   preclude a finding that the acts also constitute an undertaking
   for the benefit of another person with the consequent duty,
   running to third parties, to use due care in the performance of
   the acts.*

27. NEGLIGENCE — DUTY — QUESTION OF LAW — QUESTION OF FACT.

   *Whether the defendant owed any duty to the plaintiff is generally
   for the court to decide in negligence cases; however, the exis-
   tence of the factual circumstances establishing the conduct or
   relationship of the parties which imposes the duty as well as*

*the resolution of disputed inferences from the facts are questions for the jury.*

28. NEGLIGENCE — INSURERS — SAFETY INSPECTIONS — DUTY — QUESTION OF FACT.

*Whether an insurer undertook to render safety inspection services on the insured's premises is a question of fact that the jury must answer after considering all the evidence and drawing reasonable inferences from it; the jury must evaluate the undertaking of the insurer, the frequency of the inspections, and their character where evidence of the undertaking exists but is equivocal, as when the character or purpose of the inspections is unclear.*

29. NEGLIGENCE — FIRE INSURERS — SAFETY INSPECTIONS — DUTY — THIRD PARTIES.

*There was sufficient evidence to support a finding by a jury that a defendant fire insurer had gratuitously undertaken a duty to protect a plaintiff employee of its insured from fire hazards where the insurer had conducted inspections of the insured's premises periodically for over 40 years, the insurer held itself out to be one of the most pre-eminent fire inspection and protection companies, the insured substantially complied with the changes recommended by the insurer to minimize fire hazards, the insurer's inspectors were specifically trained to find fire hazards and violations of the National Electrical Code such as the one which caused the plaintiff's injury, there was expert testimony that the electrical system of the insured's property posed a major fire hazard, and the fire insurer had never inspected the electrical system.*

30. NEGLIGENCE — FIRE INSURERS — SAFETY INSPECTIONS — DUTY — THIRD PARTIES.

*The evidence was sufficient to support a finding by a jury that a defendant fire insurer had gratuitously undertaken a duty to protect plaintiff employees of its insured from fire hazards where the insurer's inspector had begun making recommendations that the insured comply with certain safety standards while the insured's feed mill was being constructed and continued making periodic inspections and recommendations for safety measures with which the insured most often complied, there was evidence that there was a substantial likelihood that if the insurer had recommended it, the insured would have ceased the dangerous use of a gasoline-engine industrial vehicle in the insured's feed mill which led to the explosion in which the plaintiff employees suffered their injuries, and there was*

*testimony that one purpose of the inspections was to promote a safe working environment for the insured's employees.*

31. NEGLIGENCE — FIRE INSURERS — SAFETY INSPECTIONS — DUTY — THIRD PARTIES.

*A fire insurer who has gratuitously undertaken to perform fire inspections and has performed them in a negligent manner cannot claim that the scope of the inspections was limited to minimizing the risk of damage to property, in the absence of an express contract attempting to limit liability for negligent inspection, because the risk of damage from fire hazards extends not only to all foreseeably damaged property but also to all foreseeably injured persons.*

32. TORTS — PUBLIC POLICY — STATUTES.

*The policy of tort law favors redressing people for their injuries rather than allowing tortfeasors to avoid the consequences of their wrongs; where the Legislature finds that public policy dictates that certain defendants receive protection from tort suits, it can simply grant immunity to them by statute.*

*Goodman, Eden, Millender & Bedrosian* (by *Joan Lovell* and *James A. Tuck; Richard M. Goodman,* of counsel), for plaintiffs Smith.

*Cicinelli, Mossner, Majoros & Alexander, P.C.* (by *Eugene D. Mossner),* for plaintiffs Sabraw, Bullock, Csutora and Hansen.

*Martin & Martin* and *Robert R. Day* for plaintiff Waugh.

*Davidson, Gotshall, Kohl, Secrest, Wardle, Lynch & Clark* (by *Konrad D. Kohl* and *Mary Ann Zito)* for defendants Allendale Mutual Insurance Company and Factory Mutual Engineering Association.

*Howard S. Otto (George M. Tunison,* of counsel) for defendant Michigan Millers Mutual Insurance Company.

Amici Curiae:

*Joselyn, Rowe, Jamieson & Grinnan, P.C.,* for Alliance of American Insurers, American Insurance Association and National Association of Independent Insurers.

*Lopatin, Miller, Bindes, Freedman, Bluestone, Erlich & Rosen* (by *Steven G. Silverman)* for Michigan Trial Lawyers Association.

LEVIN, J. *(for affirmance in Smith and reversal in Sabraw).* The question presented concerns the liability of a fire insurer to employees of its insured for injuries sustained as a result of fire hazards not detected and brought to the insured's attention as a result of the insurer's inspections of the insured's premises.

Defendants insured the premises where plaintiffs[1] or their decedents were employed against losses from fire. The insurers regularly inspected the premises for fire hazards.

Plaintiffs or their decedents sustained accidental injuries in the course of their employment on the insured premises as a result of electrical arcing *(Smith)* or explosion *(Sabraw).* Plaintiffs allege that the injuries were caused by fire hazards that would have been detected and, inferentially, corrected, had the insurers conducted their inspections with reasonable care. Because their exclusive remedy against their employers is a workers' compensation claim, they cannot bring an action for their employers' failure to maintain a safe place to work by detecting and correcting those hazards.

---

[1] In *Sabraw* and two related cases the plaintiffs are the administrators of the estates of fatally injured employees. In *Smith* and in *Hansen,* another case arising from the same occurrence as *Sabraw,* the wives of injured employees also sought damages for their losses.

In each of these cases, the jury returned a verdict against the insurer and the trial judge granted judgment notwithstanding the verdict. The Court of Appeals affirmed in *Smith*[2] and reinstated the verdict in *Sabraw.*[3] Because we conclude that the judgments notwithstanding the verdict were properly granted, we affirm in *Smith* and reverse in *Sabraw.*

The law does not impose a duty on insurers to inspect the premises of their insureds, although such an obligation may be undertaken.

Plaintiffs rely on concepts concerning an actor's liability to third persons for negligent performance of an undertaking, as they are expressed in the Restatement. Section 324A of the Restatement Torts, 2d, provides that, in certain circumstances, one who undertakes to render services to another which he should recognize as necessary for the protection of a third person is subject to liability if his "failure to exercise reasonable care to perform his undertaking"[4] results in physical harm to the third person.

We conclude, as did the dissenting judge in *Sabraw,* that the threshold requirement of an *undertaking to render services to another* is lacking in these cases. An insurer's inspection of an insured's premises for fire hazards does not in itself demonstrate an undertaking to render fire inspection and prevention services to the insured. Absent evidence that the insurer agreed or intended to provide services for the benefit of the

---

[2] *Smith v Allendale Mutual Ins Co,* 79 Mich App 351; 261 NW2d 561 (1977).

[3] *Sabraw v Michigan Millers Mutual Ins Co,* 87 Mich App 568; 274 NW2d 838 (1978).

[4] Although the published text of § 324A uses the word "protect" instead of "perform", this is apparently a typographical error. See *Hill v United States Fidelity & Guaranty Co,* 428 F2d 112, 115, fn 2 (CA 5, 1970).

insured, there is no basis for a conclusion that such inspections are conducted other than to serve the insurer's interests in underwriting, rating and loss prevention and hence there is no undertaking. An insurer who does not undertake to inspect for the insured's benefit owes no duty to the insured or the insured's employees to inspect with reasonable care; such an insurer is, however, subject to liability if it engages in affirmative conduct creating or enlarging a fire hazard.

I

A

On February 7, 1971, Noble Smith was operating an overhead crane in the course of his employment at Great Lakes Steel Corporation's Ecorse, Michigan, complex, when he heard a crackling noise. Smith turned around and saw sparks flying behind him. He immediately climbed over the controls, hung out of the window of the crane cab, and dropped to the concrete floor below, seriously injuring himself.

Investigation revealed that a shunt cable, part of the assembly linking the crane to its power supply, had separated and made contact with the crane cab, creating an electric arc which burned a hole two inches in diameter through the wall of the cab before contact was interrupted and the arc was extinguished. Arcing may occur in an ungrounded electrical system when more than one ground develops in the system. The ungrounded system that supplied power to Smith's crane served 30 to 40 acres of the Great Lakes plant, and grounds were continually appearing in the system.

Smith and his wife commenced an action against Allendale Mutual Insurance Company (Allendale),

which insured the Great Lakes plant against property damage from fire, and Factory Mutual Engineering Association (Factory Mutual), which by agreement with Allendale inspected the plant for fire hazards and notified Allendale and Great Lakes of problems that it observed.

Smith's theory was that Allendale and its agent Factory Mutual had voluntarily undertaken, by inspecting the Great Lakes plant, to perform Great Lakes' duty to provide its employees with a safe place to work insofar as guarding against fire hazards was concerned.[5] He contended that Allendale and Factory Mutual had breached that duty by failing to discover and warn of the risk of fire attendant upon a single ungrounded electrical system extending through large areas of the plant.[6] Smith claimed that he was injured as a result of their negligent failure to identify the hazard posed by the sprawling ungrounded system and to recommend that the system be properly limited so that accidental grounds could be located promptly and the risk of fire resulting from arcing minimized.

The jury awarded plaintiffs damages totaling $860,000. The judge granted defendants' motion for judgment notwithstanding the verdict.[7]

---

[5] Smith thus relied exclusively on clause (b) of the Restatement Torts, 2d, § 324A.

[6] Smith contended that the danger of arcing and resulting fire accompanied the ungrounded system wherever it reached and that the system served areas of the plant where inflammable substances were present. In the immediate area where Smith worked, cranes transferred coils of steel from one railroad car to another. Factory Mutual's district manager testified that this was a "very low risk" area. Smith maintained, however, that the ungrounded system could as easily have produced arcing in a high risk area, and his expert on electrical systems testified that whenever current flows out of or returns to the system through grounds, arcing may occur if there is a poor connection at the point of the ground.

[7] Although the judge's oral opinion is obscured by an apparent error in transcription, he seems to have concluded that Allendale and

The Court of Appeals affirmed, stating that the insurer's inspections were "limited in both scope and purpose" and that "employees were not included within the orbit of risk created by the duty assumed".[8]

## B

On September 15, 1969, the Farm Bureau Services feed mill at Zilwaukee, Michigan, exploded, killing three Farm Bureau employees and injuring three others.

Michigan Millers Mutual Insurance Company had insured the Zilwaukee mill for fire damage. John Vaughan, a field inspector for Michigan Millers, inspected the mill at least four times a year from the commencement of construction in 1963 until the explosion.

When he visited the mill on February 19, 1969, Vaughan was appalled by the conditions he encountered. Dust produced by milling was suspended in the air in a concentration that, in his judgment, created a high risk of explosion.[9] Vaughan informed the mill manager and a Farm Bureau vice president who happened to be on the premises of his concern but obtained little response.[10] Dust conditions in the plant remained

Factory Mutual had not voluntarily undertaken to perform Great Lakes' duty to provide a safe workplace for its employees "and therefore as a matter of law had no duty to the plaintiff".

[8] *Smith v Allendale Mutual Ins Co, supra,* pp 356, 357.

[9] Vaughan testified that fibrous dust in suspension was considered highly explosive in concentrations of from 10 to 15 percent.

[10] There had been continual "housekeeping" problems at the mill since shortly after it opened, and Vaughan had discussed these with the mill manager on many occasions. On February 19, the manager told Vaughan that lack of manpower "and an austerity budget insofar as plant improvement expenditures"—especially a long-contemplated dust control system—hampered housekeeping operations. The vice president was annoyed that Vaughan approached him and told Vaughan to proceed through normal channels.

unsatisfactory until the explosion.

Vaughan and plaintiffs' expert witness on fires and explosions agreed that the most probable explanation for the explosion centered on the "Bobcat", a four-wheeled industrial vehicle used for a number of purposes including unloading boxcars of grain and meal that arrived at the mill. Shortly before the explosion, an employee unloading a boxcar of corncob meal noticed that the Bobcat's muffler was glowing red hot and heating bits of the corncob material until they became glowing embers that floated into the mass of meal and created small "black spots". Although the employee then halted loading operations, it was likely that ignited bits of the corncob meal had already drifted into the boxcar and been loaded with the rest of the meal into a hopper from which the meal was conveyed to storage bins. In the bins some of these embers continued to burn, ignited adjacent dust, and began a chain reaction that culminated in the explosion.

Although Vaughan inspected the mill thoroughly at least four times a year for the purpose of detecting fire hazards and made safety recommendations based upon his findings, he never warned that use of the "Bobcat" in the dusty feed mill would create a danger of explosion. Vaughan testified that he was aware that Farm Bureau kept a Bobcat in the vicinity but he had never seen it used inside the mill during his many visits. He never inquired whether the Bobcat was used to unload boxcars or how the boxcars were unloaded. Plaintiffs offered testimony that boxcars were unloaded once or twice a week, usually with the Bobcat, and that the Bobcat was sometimes used inside the mill for other purposes; Vaughan thus

may not have seen the Bobcat inside the mill and then, again, he may have.[11]

The plaintiffs commenced wrongful death and personal injury actions against Michigan Millers,[12] alleging that it had negligently performed its voluntary undertaking to inspect the feed mill premises. They claimed, in addition to a voluntary undertaking by Michigan Millers to perform Farm Bureau's duty to provide a safe workplace for its employees, that Michigan Millers had increased the risk of harm by its negligence and that Farm Bureau had relied on the insurer's inspections.[13]

Following a lengthy trial of six consolidated cases, the jury found in favor of all plaintiffs and returned verdicts totaling $3,660,000. The judge granted judgments notwithstanding the verdicts.[14]

A divided panel of the Court of Appeals reversed, finding sufficient evidence of an undertaking, want of reasonable care in discharging the

---

[11] We proceed on the assumption that, if the insurer had a duty to detect and warn against fire hazards, it was a jury question whether Vaughan was negligent in failing to warn against inside use of the Bobcat.

[12] The complaints also named Fireman's Fund Insurance Company, the workers' compensation carrier for the mill, as a defendant, but plaintiffs introduced no evidence against Fireman's Fund and a directed verdict in its favor was entered at the close of plaintiffs' proofs.

[13] Plaintiffs thus relied on clauses (a)-(c) of Restatement Torts, 2d, § 324A.

[14] The judge found that "the sole proximate cause of the accident * * * was the negligence of Farm Bureau" and that "there was no evidence of an undertaking by Michigan Millers to provide a safe place to work for the employees of Farm Bureau * * *". Further, assuming an undertaking within the meaning of § 324A, the judge found no evidence that Michigan Millers increased the risk of harm to plaintiffs, undertook Farm Bureau's obligation to provide a safe place to work for plaintiffs, or induced reliance upon its efforts by employer or employee. He added that plaintiffs "had failed to present an issue of fact for the jury on the question of liability" and that the verdict on this issue "was clearly against the weight of the evidence, and the applicable law".

undertaking, and reliance, to justify the jury's verdict.[15]

We granted leave to appeal in *Smith* and in the six consolidated feed mill cases *(Sabraw)*, ordered them heard together and requested the parties to brief the question "whether the evidence supported the jury's finding that defendant had gratuitously undertaken a duty to protect employees of the insured from fire hazards, within the meaning of 2 Restatement Torts, 2d, § 324A, and had breached that duty causing injury to plaintiffs".[16]

## II

### A

Plaintiffs contend that defendants' negligence in inspecting the employers' premises for fire hazards caused the losses they suffered.

The plaintiffs do not claim that a statute or the common law imposes a duty on fire insurers to inspect for and warn of fire hazards for the benefit of the owners of insured premises, their employees, customers or other invitees. Nor do they claim that these insurance contracts provided for inspections. They contend, rather, that the defendants, by inspecting the premises, incurred a duty to the owners and to plaintiffs as their employees to exercise reasonable care in inspecting under common-law tort principles expressed in § 324A of the Restatement Torts, 2d:[17]

---

[15] *Sabraw v Michigan Millers Mutual Ins Co, supra,* pp 575-576.

[16] 406 Mich 968, 969 (1979).

[17] 2 Restatement Torts, 2d, § 323, declares the actor's liability for negligent performance of an undertaking to render services to the person to whom the services were rendered. Section 324A is a parallel provision concerning liability to third persons.

"§ 324A. Liability to Third Person for Negligent Performance of Undertaking

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect *[sic; perform]*[18] his undertaking, if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

The plaintiffs assert that a substantial number of cases, old and new, have applied the common-law rule that even a gratuitous volunteer must act with reasonable care, embodied in § 324A, to hold an insurer liable for injury to a third party resulting from its negligent inspection of insured property. Indeed, a number of Michigan cases have cited § 324A in approving actions against employers' workers' compensation insurance carriers by injured employees who claimed that their injuries were caused by negligent inspections of the workplace.[19] Plaintiffs argue that the fire inspections conducted in these cases are comparable "undertakings" which fall within the § 324A rule of liability.

Before examining this contention, we note that the application of a common-law rule to a particular set of facts does not turn upon whether those

[18] See fn 4, *supra.*

[19] *Ray v Transamerica Ins Co,* 46 Mich App 647; 208 NW2d 610 (1973); *Watson v Employers Ins Co of Wausau,* 50 Mich App 597; 213 NW2d 765 (1973); *Olkowski v Aetna Casualty & Surety Co,* 53 Mich App 497; 220 NW2d 97 (1974), *aff'd* 393 Mich 758; 223 NW2d 296 (1974).

facts can be characterized in the language of the Restatement section corresponding to the common-law rule. Unlike a statute, which expresses a legislative directive for the treatment of future cases, the Restatement seeks primarily to distill the teachings of decided cases and is descriptive. While its drafters may sometimes strive to choose "the better rule" or to predict or shape the development of the law, its influence depends upon its persuasiveness. Even where a particular Restatement section has received specific judicial endorsement, cases where that section is invoked must be decided by reference to the policies and precedents underlying the rule restated. Textual analysis of the Restatement is useful only to the extent that it illuminates these fundamental considerations.

For the reasons stated in Part II-C, *infra,* we conclude that the insurers in these cases are not liable to plaintiffs under the common-law rule restated in § 324A because on these records the relationships did not give rise to an undertaking creating a duty to inspect with due care. This result is consistent with the Restatement when § 324A is read in light of the cases that gave rise to it. It also reflects our judgment, guided by the legislative response to a prior case, of the wiser public policy.

## B

It is generally agreed that the duty question— "whether, upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other"[20]—is to be decided by the court.[21]

---

[20] Prosser, Torts (4th ed), § 37, p 206.
[21] See *Elbert v Saginaw,* 363 Mich 463, 476; 109 NW2d 879 (1961).

Plaintiffs contend, however, that where the scope and nature of the relationship between the plaintiff, defendant and others determines whether a duty is owed, the question is for the jury.[22]

It is commonplace to say that a particular defendant owes a duty to a particular plaintiff, but such a statement, although not incorrect, merges two distinct analytical steps. It is for the court to determine, as a matter of law, what characteristics must be present for a relationship to give rise to a duty the breach of which may result in tort liability. It is for the jury to determine whether the facts in evidence establish the elements of that relationship. Thus, the jury decides the question of

---

[22] Smith asserts that "[w]hen the scope of the undertaking and the nature of the ensuing relationship determine the duty owed, the issue of duty properly becomes a question for the jury". We are referred to *Bonin v Gralewicz*, 378 Mich 521; 146 NW2d 647 (1966), and *Ray v Transamerica Ins Co*, 46 Mich App 647; 208 NW2d 610 (1973).

In *Bonin v Gralewicz*, this Court reversed a directed verdict entered in favor of a defendant who backed his car out of his garage and struck his two-year-old granddaughter, whom he had left inside his house about two minutes before. Reading the circuit judge's opinion as holding that defendant owed no duty of due care to the child because her presence in the zone of danger was unforeseeable, the Court held that the jury should have been allowed to decide the fact issue of foreseeability of harm.

Since the grandfather unquestionably owed a duty to his granddaughter—as he did to all other persons who might be struck by his automobile—to drive carefully, *Bonin*, although it reached the right result, made the common mistake of combining the questions of duty and standard of care. See *Moning v Alfono*, 400 Mich 425, 437-438; 254 NW2d 759 (1977). The jury question was not whether it was "foreseeable" that a person behind, as well as one in front of, the automobile might be injured by the grandfather's negligent driving (the duty question), but whether, assuming, as a matter of law, a duty to exercise due care for the benefit of such a person, the grandfather failed to exercise due care in not foreseeing that the child might have left the house and approached the rear of the automobile (the specific standard of care question).

*Ray*, p 654, acknowledged the general rule that "the issue of duty owed a particular person is a question for the trial court" but stated —citing *Bonin*, Prosser, Torts (3d ed), § 52, pp 329-330, and Harper & James, Law of Torts, § 18.8, pp 1058-1061—that where the "relationship [between the parties] is not clear, the issue of duty may be properly given to the jury".

duty only in the sense that it determines whether the proofs establish the elements of a relationship which the court has already concluded give rise to a duty as a matter of law.

It is also for the court to determine what evidence is minimally necessary to establish the elements of a relationship on which tort liability may be premised. In the instant cases we are satisfied that the evidence, taken most favorably to plaintiffs, failed to create a jury question on whether the scope and nature of the relationships gave rise to an undertaking which would create a duty on the part of the insurers. Absent evidence supporting a conclusion that the insurers agreed or intended to provide inspection services for the employers' benefit, the threshold element of duty—which in a case based upon § 324A flows from an *undertaking to render services to another*—is lacking.

## C

Section 324A provides that an actor who *"undertakes,* gratuitously or for consideration, *to render services to another"* (emphasis supplied) may in certain circumstances be liable to foreseeable third persons for negligence. Plaintiffs maintain that by inspecting the Farm Bureau feed mill and the Great Lakes Steel plant for fire hazards, the insurers in these cases embarked upon gratuitous undertakings within the ambit of § 324A.

In our view, plaintiffs misconceive the sweep of the section's principles. The illustrations given in the official comments to § 324A and the cases cited by way of example in the Reporter's Notes involve either a contractual undertaking by a defendant to render particular services, an undertaking by an agent or employee to render services to his em-

ployer as part of the agency or employment, or an undertaking whose unambiguous object is to benefit another and which would not have been performed primarily for the actor's purposes.[23]

One can agree with the general proposition that any person, including an insurer, who assumes to act must act with reasonable care without concluding that the insurers in these cases are subject to liability under the rule of § 324A. It is not enough that the insurer acted. It must have undertaken to render services to another. Its acts do not constitute such an undertaking unless it agreed or intended to benefit the insured or its employees by the inspections.[24]

Ordinarily the question whether an actor has undertaken to render services to another is not in

---

[23] See 2 Restatement Torts, 2d, Appendix (1965), § 324A, pp 52-54.

[24] Although in analyzing what constitutes an "undertaking" under § 324A, we use terms with contract law overtones, such as "agreed" or "intended to benefit another", it should be emphasized that we are determining when an "undertaking" will give rise to tort liability, not contractual liability. We deal with the question of when a party's conduct furnishes a proper basis for the law to impose tort liability, not with the question of when a party's conduct can properly be considered as creating a contract implied in fact.

In an action to recover damages for breach of a contract a court is concerned primarily with determining the expectations of the parties and whether those expectations were reasonable. In imposing tort liability, however, a court is only concerned with whether it is appropriate public policy to impose liability for particular conduct; it does not usually consider whether the parties involved believed liability to exist. Thus, the question of what conduct is sufficient to subject a party to tort liability for a negligent undertaking is not solely a matter of what a reasonable person with whom the party deals would understand, but rather one of law in deciding whether liability should be imposed. This is especially so where the one bringing the tort action is not the one who allegedly might reasonably infer the undertaking from the party's conduct.

Although considerations appropriate in a contractual context may also be relevant in the tort context, differences in the relevant public policies, extent of liability, the nature of the relationships and the expectations of the persons involved, suggest that the question of what conduct amounts to an undertaking for the negligent performance of which the law will impose tort liability should not be confined by principles of contract law.

dispute. In the instant case, the central question, as we see it, is whether such an undertaking to serve another can be established from conduct which is consistent with an intention primarily to serve the purposes of the actor.

The law does not impose a duty upon an insurer who inspects in the absence of conduct evidencing an agreement or intent to benefit others by the inspection; only in such a case has the insurer acknowledged the propriety of judging the competence of its inspection by a standard which measures its potential effect on others. This concept of acknowledged obligation to another is comprehended by § 324A's threshold description of "[o]ne who undertakes * * * to render services to another";[25] the rule stated in § 324A by its terms does not apply to an actor following a self-serving course of conduct.[26]

While an undertaking which may give rise to liability under the rule of § 324A may be gratuitous as well as contractual, the evidence must show that the actor assumed an obligation or intended to render services for the benefit of another. Evidence demonstrating merely that a benefit was conferred upon another is not sufficient to establish an undertaking which betokens duty.

[25] See *Creameries of America v Industrial Comm,* 98 Utah 571, 580; 102 P2d 300, 304 (1940):

"In ordinary usage the term 'services' has a rather broad and general meaning. It includes generally any act performed *for the benefit of another under some arrangement or agreement* whereby such act was to have been performed. The general definition of 'service' as given in Webster's New International Dictionary is 'performance of labor for the benefit of another'; 'Act or instance of helping, or benefiting'." (Emphasis supplied.)

See, also, *Moya v Warren,* 88 NM 565, 567; 544 P2d 280, 282 (1975).

[26] An insurer who performs inspections primarily for its own benefit may be subject to liability under ordinary tort principles if its affirmative conduct results in harm to others, as where its inspector makes a suggestion whose implementation creates a new or enlarges a pre-existing risk of harm.

Persons pursuing their own interests often benefit others in the process. Accordingly, where a plaintiff seeks to prove an undertaking by conduct which benefits another and that conduct is consistent with a primary purpose on the part of the actor to benefit himself, the plaintiff must offer additional evidence to create a jury question whether there was an undertaking to render services and hence a duty to one who might foreseeably be injured by the actor's failure to perform the undertaking with reasonable care.

An inspection for fire hazards does not in itself represent that the insurer has done more than seek to reduce claims or determine whether it is willing to underwrite or remain on the risk. Identification of fire hazards and the making of recommendations to the insured do not in themselves suggest an objective other than to reduce the insurer's losses on the policy or to justify a decision by the insurer to raise or lower rates or to decline or remain on the risk; such conduct does not imply an undertaking to warn the insured of reasonably identifiable fire hazards.

This is not to say that a fire insurer may not undertake to render fire inspection services to its insured and thereby incur a duty, breach of which will subject it to liability. If the insurer promises to provide complete fire inspection services to alert the insured to fire hazards on the premises, its failure to exercise reasonable care in performing that undertaking will subject it to liability under the rule of § 324A.

Absent such a specific undertaking, there must be evidence other than the fact of inspection and consequent loss prevention to indicate that the insurer undertook to render fire inspection services for the insured's benefit before a negligent

inspection claim can be submitted to the jury. For example, if the insurer's advertising or communications with its policyholders represent that its inspection services will relieve the insured of the burden of monitoring its own facilities,[27] it has undertaken to render inspection services for the benefit of the insured and is subject to liability if it fails to exercise reasonable care in performing that undertaking. It would be for a jury to decide whether the insurer failed to inspect with reasonable care and whether that failure caused the plaintiff's injury.

In sum, a fire insurer who inspects its insured's premises for fire hazards does not, merely by making the inspections, however thorough and frequent they may be, undertake to render services to the insured.[28]

### III

The records in these cases do not support a conclusion that the defendants undertook to render fire inspection services to the employers of the injured and deceased workers.[29]

---

[27] Cf., Grimes v Employers Mutual Liability Ins Co, 73 FRD 607, 611 (D Alas, 1977), and Nelson v Union Wire Rope Corp, 31 Ill 2d 69, 79-83; 199 NE2d 769 (1964).

[28] Other courts have invoked the same rationale in denying liability in cases where the inspection was performed by the liability insurance carrier of a general contractor, Gerace v Liberty Mutual Ins Co, 264 F Supp 95, 97 (D DC, 1966), a workers' compensation carrier, Kennard v Liberty Mutual Ins Co, 277 So 2d 170, 174 (La App, 1973) (contract expressly disclaimed undertaking for benefit of insured or others), and an insurer of the plaintiff's employer against the cost of equipment repair, Hartford Steam Boiler Inspection & Ins Co v Cooper, 341 So 2d 665, 667 (Miss, 1977).

See, also, American Mutual Liability Ins Co v St Paul Fire & Marine Ins Co, 48 Wis 2d 305, 319-321; 179 NW2d 864, 871-872 (1970) (Hallows, C.J., dissenting).

[29] In Smith the Court of Appeals stated: "Any duty assumed by the defendants did not extend to the plaintiffs because employees were not included within the orbit of risk created by the duty assumed."

A

Smith emphasizes that Factory Mutual, a leading provider of fire inspection services, employed skilled engineers who were supposed to inspect every area of a plant. The Great Lakes plant was inspected twice yearly. Each inspection lasted approximately one week. The inspector was accompanied on his rounds by the plant fire chief. At the conclusion of each inspection the inspector conducted an "exit interview" to review his findings with the fire chief, and management or engineering personnel if available.

Following each inspection, the inspector prepared both an "underwriting survey" for Allendale's use and a "loss prevention report" which was forwarded to Factory Mutual's home office and from there distributed to Allendale, which in turn sent a copy to Great Lakes. There was evidence that, "on the average", Great Lakes followed the inspector's recommendations.

Factory Mutual also investigated fires after they occurred, prepared loss reports that were distributed to Great Lakes, and made recommendations on how to prevent the fire from recurring. One item on the loss report forms asked whether the conditions which caused the loss could have been detected at the last inspection and, if so, whether Factory Mutual had made appropriate recommendations.

Smith introduced copies of Factory Mutual publications discussing protection against short cir-

---

Our order granting leave to appeal in *Sabraw* requested the parties to brief the question "whether a fire insurer may include within the scope of its fire hazard inspections only 'property' and not 'persons' ".

Since our disposition rests upon the determination that defendants entered upon no undertaking giving rise to a duty to plaintiffs, it is unnecessary for us to decide that question and we intimate no opinion thereon.

cuits, inspection of electrical cables, and electrical maintenance. Factory Mutual inspectors were instructed to sit down with the insured's maintenance and engineering staff and discuss whether the National Electrical Code was being applied.

Smith argues that this evidence demonstrates an "extensive, systematic undertaking" by Allendale and Factory Mutual to provide Great Lakes with the benefit of Factory Mutual's superior experience and to assist Great Lakes in minimizing loss from fire.

While the inspections performed by Factory Mutual at Allendale's request benefited Great Lakes, it does not follow that Allendale and Factory Mutual undertook to render those services to benefit Great Lakes. All the evidence relied upon by Smith to establish an undertaking to render services to Great Lakes is equally consistent with the view that Allendale systematically attempted to reduce its losses under the fire insurance policy issued to Great Lakes. The insurer's inspections undoubtedly benefited and assisted Great Lakes because in seeking to contain its own losses, Allendale necessarily reduced Great Lakes' losses as well. The identification of fire hazards, if acted upon by Great Lakes, would tend to reduce the risk of both property damage and employee injury in the plant. There is, however, no indication that Allendale or Factory Mutual agreed or intended to inspect the Great Lakes plant for other than Allendale's loss prevention and underwriting purposes.

The contract between Great Lakes and Allendale had no provisions pertaining to inspections. While a Factory Mutual employee testified that Great Lakes wanted the benefit of Factory Mutual's fire inspection services, there was no evidence

that Allendale agreed or intended to provide the benefit of inspections more comprehensive than it chose to make for its own benefit or, indeed, that Great Lakes expected it to do so. Nor was there evidence that Allendale or Factory Mutual represented that the inspections were provided as a benefit to Great Lakes or were designed to relieve Great Lakes of responsibility for detecting fire hazards and instituting remedial measures, or even that Great Lakes thought that to be the purpose of the inspections. Perforce, there was no communication by Great Lakes that it was depending upon Allendale or Factory Mutual to conduct comprehensive inspections.

## B

The plaintiffs in *Sabraw* and its companion cases would find an undertaking by Michigan Millers on similar evidence. They emphasize that Vaughan, Michigan Millers' inspector, visited the feed mill frequently from the time construction began. He advised Farm Bureau on certain aspects of the electrical installation and recommended other fire prevention measures even before the mill opened. Vaughan inspected the mill thoroughly on many occasions. He furnished the mill management with "No Smoking" signs and posters containing safety suggestions to be posted in the plant. On at least one occasion, Vaughan directly warned Farm Bureau employees whom he observed smoking, and on another occasion he gave a presentation on fire protection and prevention to a small group of employees from the Farm Bureau complex.

Farm Bureau had a corporate safety committee, headed by an accountant in its main office, which apparently did little more than arrange occasional

meetings at which it "tried to get all locations'
safety managers at that plant to meet with us and
we would have the various insurance companies go
over the various problems". No member of the
safety committee had an engineering background
and the committee relied "to a degree" for safety
information on the insurance carriers.

Plaintiffs maintain that the record convincingly
establishes that Michigan Millers either com-
pletely assumed Farm Bureau's function of provid-
ing its employees with a safe place to work or at
least "actively joined hands in a partnership with
Farm Bureau in this respect". They acknowledge:

"[I]nsurance companies do not inspect plants and
machinery in order to save the lives of workmen, nor do
fire insurance carriers carry out their inspections to
save the property of their insureds. In each instance the
inspections are carried out, first and foremost, in order
to reduce losses and thus to retain for the insurance
carriers the valuable premium dollars which they col-
lect."

Nevertheless, they equate Michigan Millers' in-
spections with an undertaking to render services
to another giving rise to liability under the ratio-
nale of § 324A.

As in Smith, the evidence in these cases estab-
lishes no undertaking by the insurer to provide
the insured with the benefits of comprehensive fire
inspections, although incidental benefits flowed
from the insurer's effort to protect itself from
losses under the policy. Although Vaughan ac-
knowledged that detection of safety hazards could
benefit persons as well as property, there is no
evidence that the inspections were undertaken for
any purpose other than underwriting, risk analy-

sis[30] and loss prevention, and hence there is no basis for concluding that Michigan Millers undertook to render inspection services to Farm Bureau and thereby incurred a duty to Farm Bureau's employees to exercise due care in inspecting.

Again, as in *Smith,* the contract did not provide for inspections. There was no evidence that Michigan Millers agreed or intended to provide Farm Bureau with the benefit of inspections more comprehensive than it chose to make for its own benefit, or that Farm Bureau expected it to do so or communicated such an expectation. Michigan Millers did not represent to Farm Bureau that the inspections would detect reasonably discoverable fire hazards or would relieve Farm Bureau of its own duty to exercise vigilance in eliminating fire hazards in the workplace.

Even if the circumstances of this case would otherwise support an inference that Michigan Millers had undertaken such an obligation, that inference is precluded by a clause which appeared on the forms on which Vaughan's post-inspection fire prevention suggestions were forwarded to Farm Bureau. The forms stated at the bottom of the page, in relatively small type:

"The recommendations listed are made with the belief that, if followed, they will lessen the possibility of loss to your property. *We can accept no responsibility for their completeness or effectiveness,* but we consider them important and hope you will comply with them." (Emphasis supplied.)[31]

[30] Vaughan's inspections served in part to evaluate the risk. He took the conditions he found into account in formulating rating suggestions that were subject to examination and approval by the home office.

[31] For a slightly different policy provision to the same effect, see *Brooks v New Jersey Manufacturers Ins Co,* 170 NJ Super 20, 25; 405 A2d 466, 468 (1979); " '[N]either the right to make inspections nor the making thereof * * * shall constitute an undertaking on behalf of or

The insurer was entirely justified in so limiting its liability[32] under the circumstance that the law does not impose on a fire insurer a duty to inspect for and warn its insured of fire hazards.[33]

for the benefit of the insured or others, to determine or warrant that such work places, operations, machinery or equipment are safe.' "

[32] That is not to say that an insurer who expressly undertakes to provide comprehensive inspection services for the benefit of the policyholder can avoid the responsibility so assumed by a subsequent disclaimer where the inspection is actually made and report thereon delivered.

[33] Even if plaintiffs had presented evidence of an undertaking by the defendants to render inspection services to the plaintiffs' employers, it is doubtful whether they brought themselves within § 324A. Liability does not arise thereunder merely from the negligent performance of an undertaking; at least one of the three additional circumstances listed in subparagraphs (a)-(c) must also be shown.

Subparagraph (a) applies when the actor's "failure to exercise reasonable care increases the risk of [physical] harm". In the instant cases, any want of reasonable care in performing the insurance inspections did not increase the risk of harm. At most, the insurers' failure to make corrective recommendations left the risks presented by the electrical system and the Bobcat as they initially were.

Subparagraph (c) applies when "the harm is suffered because of reliance of the other or the third person upon the undertaking". Comment e to § 324A reiterates that the reliance must be a cause in fact of the injury: "Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk." 2 Restatement Torts, 2d, p 144.

In *Smith*, although there was evidence that the inspector's recommendations were routinely communicated to Great Lakes and that Great Lakes sometimes acted upon them, there was no evidence that Great Lakes had forgone its own inspections or other precautions in reliance on Factory Mutual's inspections—particularly with respect to the plant electrical system, which Factory Mutual did not inspect. Moreover, the modifications in the electrical system that Smith asserts Factory Mutual's inspectors should have recommended would have been extensive—so extensive that it is not likely that Great Lakes management would have implemented them even if it did rely on Factory Mutual to detect hazards in the system.

In *Sabraw*, the accountant who headed Farm Bureau's safety committee testified that the committee relied "to a degree" on its insurers for safety information. The safety committee, however, had little or no decision-making power. The insurer's recommendations were communicated directly to Farm Bureau management and there is no evidence that the management relied on the inspections to relieve the company of the burden of inspecting for fire hazards.

Indeed, the Farm Bureau vice president who oversaw the feed mill testified that it was Farm Bureau's responsibility to provide safety in the mill and that, while Farm Bureau "appreciated the recommendations and the assistance provided by the insurance companies, * * * the ultimate responsibility for the operation of the plant in a safe manner is that of Farm Bureau Services". He further testified that the insurer's inspections "augmented those inspections that we were making".

Subparagraph (b) applies where the actor who has undertaken to render services to another "has undertaken to perform a duty owed by the other to the [injured] third person". Plaintiffs argue that the insurers undertook to perform the duty owed them by their employers to provide and maintain a reasonably safe workplace.

Assuming *arguendo* that the insurers had undertaken to render services to plaintiffs' employers, it is by no means clear that liability can be founded upon subparagraph (b) where the duty alleged to have been assumed, the duty to provide a safe workplace, could not have been enforced in tort against the person whose duty it is claimed was assumed. With one possible exception, discussed *infra,* the illustrations given in comment *d* and the cases whose holdings are purportedly restated in subparagraph (b) involve the assumption of a duty enforceable in tort against the original holder of that duty. Here, the employer's common-law duty to provide its employees with a safe place to work has been rendered unenforceable in tort by a workers' compensation statute, which limits the employer's liability to its employees to statutory benefits regardless of the care or indifference shown for employee safety.

The exception referred to is *Mire v Lafourche Parish School Board,* 62 So 2d 541 (La App, 1952), where an injured student brought an action against a school bus driver, the school board that employed him, and the negligent driver of a car which passed the stopped school bus and struck the plaintiff as she crossed the road. The court held that the school board was not liable because, under Louisiana law, "a school district, being merely an agency of the state, is not liable for torts committed by its trustees or employees in the absence of statute imposing such liability". The court, however, concluded that the driver could be held liable both because he "did not perform the duties ordinarily found to be incumbent on public carriers" and because his written contract required him to get out of the bus and superintend the safety of children being unloaded on a main highway.

Whether *Mire* is properly cited as exemplifying subparagraph (b) is questionable. It appears that the court regarded the bus driver as a common carrier, not that the court found that the driver had undertaken to perform a duty owed by the school board as a common carrier. If the case is viewed as one in which the bus driver undertook by his contract to perform a duty owed to his passengers by the school board, the independent basis for such a duty on the part of the school board does not appear from the opinion.

In three other cases cited in the Reporter's Notes, the duty undertaken and not performed was apparently an employer's duty to provide a safe workplace. These cases, however, may be distinguished from the instant cases on other grounds. Two are pre-workers' com-

## IV

Our colleague's scholarly review of the cases suggests that the analysis in this opinion is inconsistent with prior authority holding insurers liable in negligence for injury resulting from inspections comparable to the inspections in the instant cases. Insurers' liability for negligent inspection has not, however, been universally accepted, nor is there extensive precedent supporting liability under § 324A in the fire insurance context. It is instructive to examine the prototypical cases on the subject to observe the evolution of precedent.

### A

In *Van Winkle v American Steam Boiler [Insurance] Co*,[34] the plaintiff's building was damaged

pensation tort actions against supervisory employees, while in the third case the defendants were a coal company which had elected not to operate under workers' compensation and two of its foremen. In yet another case cited by the Reporter, *State for use of Lay v Clymer*, 27 Tenn App 518; 182 SW2d 425 (1943), plaintiffs alleged that a district mine inspector and a chief mine inspector employed by the state had failed to carry out their duties to inspect the coal mine where plaintiffs were injured in an explosion. It appears from the opinion, however, that the action rested solely on a claim that the mine inspectors had breached their statutorily prescribed duties, not that they had undertaken to perform the employer's common-law duty to keep the mine reasonably safe. Again, it is questionable whether *Clymer* is properly cited as an instance where the defendant assumed a duty owed by another to the plaintiff.

Subparagraph (b) therefore does not restate law applicable to the circumstances of this case. Whether the principle embodied therein should be extended to impose tort liability on an actor who has assumed a duty that could not have been enforced in tort against the one who originally owed it is open to question. Declaring that breach of a duty not ordinarily enforceable in tort may subject a party who has undertaken to perform that duty on behalf of another to tort liability appears to attach undue significance to an ephemeral distinction between duty and remedy. Yet one may posit cases where it is not altogether clear that an immunity from tort liability enjoyed by the original holder of a duty should be transferred to one who undertakes to perform that duty. We intimate no opinion on this difficult question of public policy.

[34] *Van Winkle v American Steam Boiler [Insurance] Co*, 52 NJL 240; 19 A 472 (1890).

when a steam boiler burst in an adjacent building owned by the insured. The insurer had covered the insured's boiler under a policy which permitted, but did not require, the insurer's inspectors to inspect the boiler. The policy also provided that "should such inspector, upon said examination, *discover any defect* affecting the safety of said boiler or boilers or machinery, *he shall notify* the assured" (emphasis supplied), and that the policy should be void "if the load on the safety valve shall be exceeded as approved by the inspector * * * according to the inspector's certificate, issued to the assured after each inspection".[35] The insurer had made repeated inspections of the boiler and had issued the mentioned certificates for the guidance of the insured's engineer.

In *Van Winkle,* the court emphasized that the case concerned the management of a highly dangerous instrumentality, an activity for which courts showed special concern in developing common-law tort liability.[36] Moreover, the insurer's inspections were confined to a single, highly dangerous machine and the insurer had undertaken to

---

[35] *Id.,* pp 241-242.

[36] "There is a public duty, to exercise great care and skill incumbent on those *having charge of instruments which, if mismanaged, are highly dangerous* to the lives and persons of men who happen to be in their neighborhood; and for the non-performance of such duty a person specially injured thereby is entitled to sue." *Id.,* p 240 (syllabus by the court; emphasis supplied).

"What this defendant did was this: It co-operated with the owner of this dangerous instrument in its management, in a particular indispensable to its safe use, and *it thereby, in that degree, constituted itself the agent, or the substitute, of such owner. It performed a series of acts that could not be performed by the owner without the responsibility just mentioned;* and as such responsibility belonged not to the ownership of the machine, but to the function of operating it, it does not seem that any one could perform such function without incurring the responsibility. Very plainly the defendant stood within the spirit of the rule that laid upon *the proprietor of the boiler* the duty of exercising care and skill in its use." *Id.,* pp 245-246 (emphasis supplied).

inform the insured of any defects discovered. The court concluded as a matter of law that the insurer had undertaken to discharge the insured's obligation to inspect the boiler. In the instant cases, the inspections did not focus on a specific instrumentality, there is no agreement to inform the insured of any defects discovered during the course of an inspection, and no basis in the insurance policy for concluding that the insurer undertook to provide inspections coextensive with the owner's duty to inspect.

*Hartford Steam Boiler Inspection & Ins Co v Pabst Brewing Co*[37] also involved a boiler explosion. Hartford had insured boilers used in Pabst's Milwaukee brewery under an insurance policy similar to the policy issued in the *Van Winkle* case; this policy even specified the maximum load on the safety valve. Hartford continually inspected the boilers and made reports to the insured. When three boilers exploded, devastating the boiler building, the insured sought to recover damages in tort as well as in contract on a theory of negligent inspection. Although a verdict in favor of the insured was reversed for instructional error, the Seventh Circuit recognized that a tort cause of action could be maintained on the facts of the case, but its language left no doubt that the mere performance of such inspections was not sufficient to show "the undertaking of duty":

"Inspection of the boilers necessarily requires care and skill in its performance for safety in their use, and, *when thus undertaken by the insurance company to serve as a benefit to the assured, the duty arises,* with or without contract obligation to inspect, to exercise reasonable care and skill in each inspection so made,

[37] *Hartford Steam Boiler Inspection & Ins Co v Pabst Brewing Co,* 201 F 617 (CA 7, 1912).

*although no such rule of duty obtains in favor of the assured where the inspections are attributable alone to the policy provision for the sole benefit of the insurer,* which would leave no ground for a finding of fact that they were *understood between the parties to be made and accepted as inspection service for direct benefit to the brewing company."* (Emphasis supplied.)[38]

What evidence illuminated the purpose of the inspections or the parties' understanding thereof?

"Advertisements of the insurance company accompanied its above-mentioned reports to the assured, calling attention to the benefits which were given with the insurance, through its competent experts engaged in the inspections, as a means 'for immunity from an explosion,' a service 'superior even to providing indemnity for a loss,' and stating that about one-half of the premium received was expended for such inspections, making their insurance desirable 'to provide for regular and thorough inspection' and maintain 'safe operating condition.' "[39]

Thus, the facts of the *Pabst* case, which actually illustrates the principles of § 323 of the Restatement[40] rather than § 324A, emphasized, in addition to insurer participation in the management of a dangerous instrumentality and narrowly focused inspections of it, insurer representations that the inspections were conducted as a benefit to the insured.

With the exception of a few subsequent cases permitting suits against insurers who had undertaken to perform elevator inspections and furnish

[38] *Id.,* p 629.

[39] *Id.*

[40] See fn 17, *supra.*

certificates required by law,[41] thereby rendering to
the building owner a service necessary to opera-
tion of the elevator, the concept of insurer liability
to third parties for injuries said to result from
negligent insurance inspections remained dormant
until 1960.

*Smith v American Employers' Ins Co*[42] trans-
planted this concept into the fertile field of work-
ers' compensation, where an employer has no re-
sponsibility in tort for unsafe conditions, and it
was sought to hold its workers' compensation car-
rier liable on a theory of negligent inspection.

Smith lost both her legs when a compressed air
tank near which she worked exploded. She sued
American Employers', which had provided her
employer with workers' compensation insurance
and had conducted monthly inspections of the
plant, including the tank which had exploded.
Although treating the issue as primarily a ques-
tion of statutory construction—whether the in-
surer shared the employer's immunity from tort
liability or was subject to liability under the third-
party recovery section of the workers' compensa-
tion act—the court invoked common-law principles
in sustaining Smith's claim against the insurer:

"[O]ne who undertakes to act, even gratuitously, may
be liable to persons injured by his failure to use due
care. * * * This liability extends to all who may fairly
be said to come within the orbit of risk created by the
actor's negligence. * * * We need not labor the point
that the plaintiff employee, working in proximity to the
tank which exploded, falls squarely within the class
entitled to protection."[43]

[41] *Sheridan v Aetna Casualty & Surety Co,* 3 Wash 2d 423; 100 P2d
1024 (1940); *Bollin v Elevator Construction & Repair Co,* 361 Pa 7; 63
A2d 19 (1949).

[42] *Smith v American Employers' Ins Co,* 102 NH 530; 163 A2d 564
(1960).

[43] *Id.,* 533-534.

Roughly half the courts which have since had occasion to construe workers' compensation statutes have followed *Smith* in permitting injured employees to maintain common-law actions for negligent inspection against their employers' compensation carriers.[44] The other half, however, have held such suits prohibited under the applicable workers' compensation acts.[45]

It is noteworthy that in those jurisdictions, including Michigan, where the injured employee was found to have a common-law tort remedy against the compensation carrier, the state legislatures usually responded with amendatory legislation extending the employer's exclusive remedy protection to the insurer.[46]

Although disclaiming the need for plaintiff to prove reliance on the inspections, the leading case to follow *Smith, Nelson v Union Wire Rope Corp,*[47] emphasized that the insurer's safety inspections had encompassed the hoist whose collapse resulted in injury and that the record "fully negates any concept that defendant's gratuitous inspections were solely for its own internal purposes".[48] There was voluminous evidence that the insurer in that

[44] *Mays v Liberty Mutual Ins Co,* 323 F2d 174 (CA 3, 1963) (Pennsylvania law); *Fabricius v Montgomery Elevator Co,* 254 Iowa 1319; 121 NW2d 361 (1963); *Nelson v Union Wire Rope Corp,* 31 Ill 2d 69; 199 NE2d 769 (1964) (Florida law); *Ray v Transamerica Ins Co,* 10 Mich App 55; 158 NW2d 786 (1968); *Bryant v Old Republic Ins Co,* 431 F2d 1385 (CA 6, 1970) (Kentucky law); *Beasley v MacDonald Engineering Co,* 287 Ala 189; 249 So 2d 844 (1971).

[45] For a listing of these cases, see 2A Larson, Workmen's Compensation Law, § 72.90, fn 29, and Comment, *Insurer's Liability for Negligent Performance of Voluntary Safety Inspections,* 3 Cumberland-Samford L Rev 118, 124-128 (1972).

[46] See NH Rev Stat Ann § 281:2(II); Iowa Code 88A.14 (since repealed); Pa Stat Ann, title 77, § 501; Fla Stat Ann § 440.11(2); and Ala Code § 25-5-11. Regarding the legislative response in Michigan, see fn 58 *infra,* and accompanying text.

[47] *Nelson v Union Wire Rope Corp,* fn 44 *supra.*

[48] *Id.,* pp 79, 83.

case had undertaken to render services to its insureds.[49]

## B

It is understandable that the concept of insurer liability for negligent inspection, which originated with inspection of a specific and uniquely dangerous instrumentality pursuant to an express undertaking, might be rekindled in the workers' compensation context. Clearly, an imperfection in a particular machine or piece of equipment can impose a highly specific risk to those who work with or near it. The proximity of the employee to the machine or equipment and the foreseeability that he or she will be injured if a defect or

---

[49] "[D]efendant constantly represented that those who insured with it would receive countless extra safety and monetary benefits through the services of defendant's 'safety experts' or 'safety engineers.' An advertising symbol referred to as 'Mr. Friendly' was adopted, and by a series of advertisements placed in both national and trade publications, such representations as the following were made: (1) 'In case after case, month after month, American Mutual's safety engineering service has helped contractors all over the country reduce accidents and costs;' (2) that insureds 'have worked hand in hand with American Mutual Safety Engineers to build safety into every job;' (3) after explaining that one insured had saved money, the method was stated to be: 'Close cooperation between Hittig Management and American Mutual Safety Engineers in designing and operating an effective safety program;' (4) 'Thanks to thorough investigation and hazard analysis * * * and immediate investigations when accidents have occurred, this nationally known firm has been able to maintain a good accident record and to lower operating costs.' These are but samplings of many representations that could be stated, but, in general, the tenor of each of the 29 advertisements admitted in evidence was that the safety engineers took an active part in the safety programs of the insureds and saved lives, limbs and money. A former executive of defendant, testifying directly to the function of the safety engineers, stated that it was to help the insureds to reduce accidents and to determine what were or were not unsafe practices. From all of the evidence it appears that defendant's safety engineers, and the various financial and safety benefits claimed to inure to insureds as a result of their safety engineering services, were its chief stock in trade. Just as certainly, it appears beyond a shadow of a doubt that the services gratuitously given by the engineers were not solely for defendant's own purposes." *Id.,* pp 79-80.

dangerous condition manifests itself suggest at first blush that one who inspects a particular machine or piece of equipment and fails to detect and warn of a danger which could reasonably have been discovered should be liable for negligence if the danger thereafter results in injury to the employee. The case for recovery is less compelling intuitively where the hazards for which a fire insurer inspects may occur virtually anywhere within a large plant and may endanger any person who happens to be on the premises, and where the primary focus of the inspections is not hazards which can only cause personal injury but, rather, those which may cause property damage without necessarily injuring persons.

Only a smattering of authority to date supports applying the common-law principles developed in the boiler insurer and workers' compensation carrier cases and which find expression in § 324A to insurers whose inspections fail to reveal fire hazards. Two of the three cases noted by counsel appear to be reconcilable with the analysis adopted here; all three cases reached the appellate courts before trial and thus the facts relied on to show an undertaking to render services to another were not fully developed.

In *Johnson v Aetna Casualty & Surety Co*,[50] plaintiff's decedent was a firefighter who died while attempting to extinguish a fire in an A & P supermarket. A motion to dismiss brought by Aetna, the store's public liability insurer, was denied. The court relied exclusively on the text of § 324A and the plaintiff's allegations that defendant "breached its contractual duty * * * to inspect the premises and report to the A & P any

_____
[50] *Johnson v Aetna Casualty & Surety Co*, 348 F Supp 627 (MD Fla, 1972), *reversing* 339 F Supp 1178 (MD Fla, 1972).

and all hazards to life or property".[51] Such an allegation pleads an undertaking to render inspection services which gives rise to a duty to inspect with due care.

*Sims v American Casualty Co*[52] reversed a summary dismissal of an action against insurance companies which provided coverage other than workers' compensation to the employer of Sims, who died of burns suffered when a volatile alcohol-based product with which he worked ignited. Although the court stated that "defendants' duty may arise from contract *or* from undertaking actual inspections without contract",[53] it appears that the complaint alleged that "the inspections were made not only to rate the risk but to help [Sims' employer] reduce its accidents and losses and to protect the lives, health and safety of its employees".[54]

*Hill v United States Fidelity & Guaranty Co*[55] upheld the potential liability under § 324A of a hotel's public liability insurer for negligent inspection. The opinion does not reveal any claim that the inspections were undertaken for the benefit of the insured but notes that insurer inspections serve "the interests of the class of hotel guests * * * and the interests of the hotel" as well as the insurer's "interests in underwriting, establishing rates, and minimizing losses * * *".[56] We are not persuaded by the *Hill* case, which responded to concerns about the social utility of subjecting in-

---

[51] *Id.,* 339 F Supp, p 1179.

[52] *Sims v American Casualty Co,* 131 Ga App 461; 206 SE2d 121 (1974), *aff'd per curiam sub nom Providence Washington Ins Co v Sims,* 232 Ga 787; 209 SE2d 61 (1974).

[53] 131 Ga App, p 473.

[54] *Id.,* p 467.

[55] *Hill v U S Fidelity & Guaranty Co, supra.*

[56] *Id.,* p 120.

surers to tort liability for injuries resulting from
negligent inspection by simply noting that plain-
tiffs had alleged reliance on the insurer's inspec-
tions.

We find no case in which a verdict against a fire
insurer reached the appellate courts or which has
considered in such a developed factual context the
concerns here addressed.

## V

### A

The development of common-law principles is
shaped by considerations of public policy. Amici
curiae insurers contend that an adverse decision
will either discourage insurance inspections or
cause insurers to institute such thorough inspec-
tion programs that the cost of insurance will be
greatly increased, perhaps beyond the reach of
many businesses. Amicus curiae Michigan Trial
Lawyers Association contends that these scenarios
are fanciful and that insurers should be shielded
from the usual application of common-law negli-
gence principles only by the Legislature.

The common-law principles relied on by the
plaintiffs do not subject an insurer to liability for
negligent inspection unless it undertakes to in-
spect for the insured's benefit. In assessing the
proper development of these principles, we find
compelling that, after the Court of Appeals permit-
ted maintenance of actions against workers' com-
pensation insurers for employee injuries proxi-
mately resulting from negligent safety inspec-
tions,[57] the Legislature amended the workers' com-
pensation act to preclude third-party actions

[57] *Ray v Transamerica Ins Co*, 10 Mich App 55; 158 NW2d 786
(1968).

against the carrier based upon its furnishing of, or failure to furnish, safety inspections.[58] This amendment expresses a policy judgment that the societal benefits obtained from not burdening the insurer's decision to inspect its risks with the disincentive of tort liability outweigh whatever advantage might be realized from insistence that such inspections be conducted with due care. Although this amendment was by its terms confined to workers' compensation carriers, we are guided by the policy judgment implicit in the legislative decision.

Insurers' inspections can detect hazards before they manifest themselves in harm and thus reduce the social costs of property damage and injury. Even a negligent inspector may detect far more hazards than he misses.

Imposition of liability upon insurers who conduct inspections, without regard to whether they have agreed to provide inspections as a service to their insureds, might either drastically reduce inspections or raise premiums dramatically to meet the cost of more extensive inspection programs and judgments. If fire insurers were to become responsible to those on the premises should a jury decide that the injury was attributable to negligence in inspecting for fire hazards, the premium heretofore based on the risk of property damage must necessarily be substantially enlarged to reflect such public liability exposure.

Imposing such liability would not improve the safety of the premises unless the insured acts on insurers' recommendations. Unless all insurers require the insured to implement insurers' recommendations, many insureds will decline to do so, preferring to find a carrier willing to insure the risk even at a greater cost.

---

[58] 1972 PA 285, amending MCL 418.131; MSA 17.237(131) and MCL 418.827; MSA 17.237(827).

Imposing such responsibilities on fire insurers has doubtful social utility in comparison to the aggregate cost of the disruption of established underwriting relationships, the additional premiums charged insureds by other sources for insuring the same risk theretofore insured but now declined, the litigation generated against fire insurers, the general increase in all premiums to cover the additional exposure of fire insurers attributable to the newly imposed public liability and marginal repairs ordered by an overly cautious inspector.

As the records in these cases indicate, many employers will comply to a degree with insurers' recommendations. We have no basis for concluding that the additional degree of compliance obtainable by imposing enlarged responsibilities on fire insurers would justify the costs.

In assessing the wisdom of enlarging the tort liability of fire insurers, we have taken into account that an owner of premises owes a common-law duty of safe maintenance to persons on the premises unless, as in the case of an owner-employer in respect to his employees, a statute has relieved him of that responsibility, and that owners of premises of sufficient value so that fire insurers conduct inspections generally maintain public liability insurance within limits ordinarily adequate to compensate persons injured on the premises by unsafe conditions.

B

Although it is implicit in plaintiffs' claim that their employers were also negligent, the employers are not named as defendants because the exclusive remedy of an employee against his employer is his claim for workers' compensation.

In *Funk v General Motors Corp,*[59] this Court said:

"An unstated premise of the legislative reference to the law of torts is that the development of that body of law will neither be stimulated nor impeded because the result would create or deny a workman a source of recovery alternative to workmen's compensation.

"The question whether there is, under the law of torts, an alternative source of recovery to workmen's compensation is to be decided without regard to whether other workmen 'similarly situated' have such a source or whether a decision adverse to liability may deny any alternative source of recovery to a particular workman."

In *Funk* we concluded that the imposition of liability on a general contractor who was not plaintiff's employer for failure to implement safety measures in common work areas to guard against readily observable and avoidable serious risks of personal injury was "an appropriate development of the law of torts" and that the basis of the owner's liability, exercise of retained control, "has long been established".

In the instant cases we conclude that it would not be an appropriate development of the law of torts to impose liability on a fire insurer on the facts presented.

If liability were to be imposed, the additional exposure of the fire insurer would be essentially for the benefit of third persons (employees, customers and other invitees), not the insured for whose benefit the insurer nominally is said to have undertaken this added responsibility. The insured ordinarily will be impeded in maintaining an ac-

[59] *Funk v General Motors Corp,* 392 Mich 91, 112; 220 NW2d 641 (1974).

tion for negligent inspection because its own omissions may be a cause of whatever loss it suffers. More fundamentally, the insurer and insured have agreed upon the amount that the insurer is required to pay in the event the undetected fire hazard causes property loss. Unless the insured is an individual who is himself injured in the fire, his property loss should be reimbursed by the insurer pursuant to the policy and any inadequacy in such compensation would generally be the result of rejection of coverages *(e.g.,* business interruption) or of deductibles or co-insurance to which the insured had agreed.

The office of this new application of "well-established principles of tort law" thus would be essentially to provide an alternative to workers' compensation for injured employees and an alternative means of recovery to customers and invitees where the insured failed to maintain adequate limits of public liability insurance. But the cost of providing such additional protection to workers would inevitably be passed on to employers in the form of increased fire insurance premiums, a result inconsistent with their limited liability for injuries suffered by their employees.

## VI

We conclude that, unless the insurer agrees or intends to provide the insured with fire inspection services and advice guarding against reasonably discoverable fire hazards, a negligent failure to detect and warn of such hazards in the course of an inspection is not actionable.

We affirm the Court of Appeals in *Smith* and reverse in *Sabraw.*

COLEMAN, C.J., and KAVANAGH, FITZGERALD, and RYAN, JJ., concurred with LEVIN, J.

BLAIR MOODY, JR., J. *(for reversal in Smith and affirmance in Sabraw).* We granted leave to appeal and consolidated these matters to consider whether, within the meaning of 2 Restatement of Torts, 2d, § 324A, there was evidence to support the jury findings that defendants had gratuitously undertaken a duty to protect the employees of the insured from fire hazards and had breached that duty, causing injury to plaintiffs. Additionally, we are asked to consider whether a fire insurer may include within the scope of its fire hazard inspections only "property" and not "persons".

Based upon principles developed at common law and upon § 324A, we determine that there was indeed evidence to support the juries' findings that defendants had gratuitously undertaken a duty to protect the employees of the insured from fire hazards and had breached that duty, causing injury to plaintiffs. Further, we recognize that a fire insurer may attempt to expressly limit its liability by contract. However, when there is no such express limitation and the insurer has gratuitously undertaken to perform fire inspections and has performed the inspections in a negligent fashion, the insurer cannot claim that the scope of its inspections was limited to property only because the orbit of risk from fire encompasses not only all foreseeable property but also all foreseeable persons as well.

Accordingly, we would reverse the Court of Appeals in *Smith* and remand to the trial court for reinstatement of the verdict. We would affirm the Court of Appeals in *Sabraw.*

FACTS

*Smith*

On February 7, 1971, plaintiff Noble Smith was

operating an overhead crane in Building B of the Great Lakes Steel facility in Ecorse, Michigan. In the process of making a lift, plaintiff heard a crackling noise and saw sparks flying. Fearing an extensive electrical fire, plaintiff climbed from his crane cab and dropped 35 to 40 feet onto the concrete floor below, sustaining serious injuries.

An investigation of the circumstances surrounding the accident revealed the following facts: Electrical power was supplied to the Great Lakes Steel complex by means of an ungrounded electrical system, which ran the entire length of the 30- to 40-acre facility. Somewhere within this vast electrical network a ground had occurred with a subsequent short circuit. Sometime later, at the time plaintiff was operating his crane, a second ground occurred in the system. Specifically, the shunt cable, which is part of the assembly linking the crane to its power supply, separated and made contact with the crane cab. This contact resulted in the formation of the second electrical ground. This ground in combination with the first undetected and unrepaired ground caused an electrical arc with resultant sparking and fire at the crane cab site.

Plaintiff and his wife filed suit against Allendale Mutual Insurance Company (Allendale), which carried a policy of insurance for fire damage to property at Great Lakes Steel. Also joined in the action was Factory Mutual Engineering Association (Factory Mutual) which had contracted with Allendale to perform fire hazard inspections at the Great Lakes complex.[1]

---

[1] The pertinent provisions of the engineering service agreement between Allendale and Factory Mutual, providing for the performance of comprehensive fire services by Factory Mutual on behalf of Allendale are as follows:

"2.1(c). *Fire and Other Inspection and Engineering Services.* The

At trial, plaintiffs presented, within the following factual setting, their theory regarding defendants' duty and the breach of that duty which resulted in plaintiff's injuries: Plaintiffs began by acknowledging that ungrounded electrical systems are commonly used in industrial settings. However, to be in conformity with the guidelines of the National Electrical Code, an ungrounded electrical system must be properly *limited* so that the location and cause of an accidental ground can be quickly detected and repaired before a second ground can occur. The electrical system at the Great Lakes facility was not properly limited, so that when the first ground occurred it was not detected and corrected, resulting in the arcing when the second ground occurred in the crane shunt cable.

Further, plaintiffs presented expert testimony to the effect that the non-limited electrical system posed a major fire hazard for the whole Great Lakes facility. Since all the electrical circuitry in the whole facility was interconnected, further

---

term 'fire and other inspection and engineering services' shall mean any and all engineering and inspection services relating to property insurance and reinsurance performed by the Association involving insureds or prospective insureds, including, but not limited to (1) complete loss prevention engineering in order to preserve property and to prevent losses thereto; (2) the inspection, evaluation and testing of insured or prospective insured property; (3) the appraisal of insured property; (4) the establishment of standards for, and the evaluation and testing of protective devices, whether or not related to policies of insurance and reinsurance.

"3. *Performance of Services by the Corporation.* The Factory Mutual Engineering Corporation (The 'Corporation') shall perform or cause to be performed for * * * the Association any and all services being performed as of the date hereof and hereafter by the Corporation as may relate to property or boiler and machinery insurance, including but not limited to (1) research on causes and prevention of loss to property; (2) establishment of standards for loss prevention and protective devices; (3) compilation and analysis of accounting and statistical data; and (4) rendition of appropriate written reports regarding such services."

grounds could occur in the system with further sparking and fire throughout the complex.

In contrast, the inspector for Factory Mutual testified that although numerous inspections had been conducted at the Great Lakes complex the electrical system had never been inspected. The inspector did acknowledge that failures in electrical systems frequently cause fires in industrial settings and that at least one out of every five fires in industry results from electrical failures.

From all this, plaintiffs theorized that Allendale and its agent Factory Mutual had gratuitously undertaken a duty to protect the employees of the insured from fire hazards. By its failure to inspect the electrical system and to detect the major fire hazard posed by the improperly limited electrical system, defendant had failed to use reasonable care in carrying out its undertaking. This failure breached the duty to plaintiff and resulted in his injury.

The jury returned a verdict in favor of plaintiffs. The trial judge granted defendants' motion for judgment notwithstanding the verdict. The Court of Appeals affirmed. 79 Mich App 351; 261 NW2d 561 (1977).

*Sabraw*

On September 15, 1969, an explosion occurred at the Farm Bureau Services feed mill in Zilwaukee, Michigan. Three Farm Bureau employees were killed and three were seriously injured.

It was generally agreed that the most probable cause of the accident was overheating of the unshielded and unprotected exhaust pipe of the "Bobcat", a gasoline-engine industrial vehicle which was used for loading and unloading boxcars at the mill and for other purposes. On the day of the explosion, a Farm Bureau employee was using the

Bobcat to unload a boxcar filled with corn cob meal. The corn cob meal was transferred by the employee to the Bobcat, from the Bobcat to a hopper, and from the hopper by means of an auger and elevators up into bins for final storage.

After having unloaded between 1/3 and 1/2 of the boxcar, the employee noticed that the muffler of the Bobcat was glowing red hot and that "red ash" was floating in the air and dropping on the floor of the boxcar, forming small "black spots" in the corn cob meal. Becoming concerned, the employee shut off the engine of the Bobcat and summoned Mr. Euler, the assistant mill manager. Euler immediately had the Bobcat removed from inside the mill to have it hosed down with water and cooled off. He instructed two employees to take shovels and remove the black spots from the smoldering corn cob meal and have it taken outside and dropped on the ground.

As the employees were removing the black spots, a disastrous explosion and fire occurred within the mill, blowing out the concrete and steel walls. Again, it was generally agreed that the explosion resulted from the black-spotted smoldering corn cob meal being transported up into the mill where it combined with the large amounts of dust in the bins to create an explosion.

The plaintiffs brought wrongful death and personal injury actions against Michigan Millers Mutual Insurance Company (Michigan Millers), which had contracted with Farm Bureau as Farm Bureau's fire insurance carrier.

Plaintiffs presented the following factual setting for its legal theory that Michigan Millers owed a duty toward the employees of Farm Bureau and breached that duty by its negligence in inspecting the Farm Bureau facilities: Construction plans

were made for the Zilwaukee grain elevator by
Farm Bureau Services in August 1963. Farm Bu-
reau invited John Vaughan, an inspector for Mich-
igan Millers, to view the site prior to construction
and participate in the construction by making
recommendations for water and fire protection.
Vaughan became an active participant in the proj-
ect, making recommendations regarding installa-
tion of electrical equipment and insisting that
Farm Bureau comply with certain safety standards
dealing with fire and explosion protection.

After completion of the plant, Vaughan contin-
ued to make voluntary inspections of the facilities.
There was no provision in the insurance contract
which called for or required these inspections.
Vaughan's inspections continued regularly, at
least four times a year, right up to the time of the
explosion.

Defendant argued that Vaughan's inspections
were not "safety inspections" but were made
strictly for insurance rate-making purposes. Vau-
ghan himself, however, testified that his inspec-
tions had more than a mere rate-making function.
He testified that his inspections accomplished two
things: prevention of fire and explosion and safe-
guarding of employees by preventing fire and ex-
plosion. On other occasions, Vaughan character-
ized the purpose of his inspections "to minimize
danger of loss or injury" and his recommendations
were to promote "fire safety and employee health".

From their testimony, Farm Bureau management
and employees relied on Vaughan's inspections
and viewed them as promoting employee safety.
Further, Vaughan provided "No Smoking" signs
for the plant and directly warned employees re-
garding smoking and other safety concerns.

As Vaughan continued his inspections, he be-

came more and more distressed by the hazardous conditions which existed at the mill. On February 19, 1969, seven months before the explosion, he conducted an inspection. Concerned by the conditions at the mill, Vaughan immediately tried to contact "anyone in authority" to report the apparently hazardous conditions. He was able to contact Farm Bureau's Executive Vice President and advised him of the imminent danger posed by conditions at the facility. Apparently, because of the forcefulness of his presentation, the Executive Vice President became irate and threatened to cancel his insurance coverage. This led directly to Vaughan's being reprimanded by his own superiors. In addition, Michigan Millers sent a letter of apology to Farm Bureau.

For all his efforts, Vaughan admitted that at no time did he ever inspect the Bobcat, although he knew of its existence, nor did he advise anyone of the danger of operating the Bobcat within the mill. Vaughan did state that he knew that it was dangerous to operate a gasoline-engine vehicle inside a grain elevator.

It is within this framework that plaintiffs posited their legal theory. Plaintiffs claimed that Michigan Millers had negligently performed a voluntary undertaking, *i.e.,* to inspect the feed mill and thereby provide a safe workplace for Farm Bureau's employees. In addition, plaintiffs claimed that Farm Bureau management and employees had relied on the voluntary undertaking and that because of the negligent fashion in which the undertaking was performed, Michigan Millers had actually increased the risk to the Farm Bureau employees.

The jury found in favor of all plaintiffs. The trial judge granted defendant's motion for judgment

notwithstanding the verdict. The Court of Appeals reversed. 87 Mich App 568; 274 NW2d 838 (1978).

## DISCUSSION

Two interrelated issues are presented in the instant case: (1) whether the evidence supported the juries' findings that defendants had gratuitously undertaken a duty to protect the insured's employees from fire hazards, within the meaning of 2 Restatement of Torts, 2d, § 324A, and had breached that duty causing injury to plaintiffs; and (2) whether a fire insurer may include within the scope of its fire hazard inspections only "property" and not "persons".

The central focus of the issues in this case is § 324A of the Restatement of Torts. Section 324A provides:

"Liability to Third Person for Negligent Performance of Undertaking

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect [sic; perform?] his undertaking if

"(a) his failure to exercise reasonable care increases the risk of such harm, or

"(b) he has undertaken to perform a duty owed by the other to the third person, or

"(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."

However, before examining the application of § 324A to an insurer's actions in performing fire inspections, it is first necessary to examine how the courts of a number of jurisdictions of the

United States have treated at common law claims against insurers for the negligent performance of fire and other types of safety inspections. As the discussion which follows will show, the courts developed certain principles which later courts were to adopt in the context of actions predicated upon § 324A of the Restatement. While neither the earlier common-law decisions nor the later decisions based upon § 324A are binding upon this Court, they do present certain basic universal principles which are applicable in all negligent-inspection cases and which are illuminative of the issues presented in the instant case.

I

The first case in the United States to discuss the liability of an insurer for negligent inspection was *Van Winkle v American Steam Boiler Co,* 52 NJL 240; 19 A 472 (1890).[2] In *Van Winkle,* defendant insurer had written a policy of insurance for a steam boiler which was located on the property of the Ivanhoe Paper Company. Plaintiff Van Winkle owned a building near the Ivanhoe Paper Company. As part of the insurance contract between defendant American Steam Boiler and Ivanhoe there was a stipulation that American Steam Boiler had the "right" to inspect the steam boiler on Ivanhoe's premises, if it chose to do so. There was no obligation to inspect. Defendant did make regular inspections but failed to discover a dangerous condition in the boiler. The boiler ultimately exploded, damaging both the property of the in-

[2] For a general discussion of the *Van Winkle* decision and the decisions which followed *Van Winkle,* see Comment, *An Insurer's Liability to Third Parties for Negligent Inspection,* 66 Kentucky LJ 910 (1978); Comment, *Insurer's Liability for Negligent Performance of Voluntary Safety Inspections,* 3 Cumberland-Samford L Rev 118 (1972).

sured and the neighboring property owned by plaintiff.

Plaintiff brought suit against the insurer for damages to the property as a result of the explosion. Plaintiff argued that it was entitled to recovery based upon the contract between defendant insurer and the insured:

"The declaration avers, and the fact, of course, is admitted by the demurrer, that the defendant, in the exercise of its volition, made repeated inspections of the boiler in question, and furnished the required certificates for the guidance of the engineer of the assured. No one can doubt that, by such a course of action, a duty in favor of the assured was imposed on the defendant, by the operation of the contract itself, to act with ordinary skill and care, both with respect to its inspection and its certificate. It is deemed that there is no room for doubt that for the proximate damage occasioned by the absence of such care and skill the defendant became answerable to the assured *per contractum;* it had stipulated for such care and skill by the terms of its contract, read in the light of legal rules." *Van Winkle,* 242-243.

While the court recognized a cause of action on the part of the insured, the court could find no such corresponding cause of action for plaintiff based upon the contract between the insurer and insured.

The court's analysis did not end here. While no contractual action might obtain, the court found that principles of tort law and of public policy were applicable to this situation. The court stated:

"Very plainly the defendant stood within the spirit of the rule that laid upon the proprietor of the boiler the duty of exercising care and skill in its use. That rule is but the creature of social justice. That a man cannot do an act for his own benefit or pleasure, the natural

consequence of which will be detrimental to the equal rights of another, is an equitable principle of importance to the common welfare; and the rule that one man cannot with impunity assist another in doing such wrongful act, appears to be a necessary corollary to the proposition, unless such proposition is to be regarded as purely formal and arbitrary. In the present instance, this boiler burst and injured the adjacent property of the plaintiff solely, as the facts now appear, by reason of the omission of a proper test and inspection; the defendant, by its inspector, was in the actual performance of that function, and it was its agent that was morally and primarily at fault; it would seem, therefore, quite unreasonable to say that the defendant, whose servant the inspector was, is not liable; but that the Ivanhoe Paper Mill Company, whose servant the inspector was not, is liable." *Van Winkle,* 246.

While the court's initial statements were couched in agency language, the court went further to find a duty on the part of a party that voluntarily undertakes an activity, which if performed negligently could result in damage to the property and person as follows:

"[I]n all cases in which any person undertakes the performance of an act which, if not done with care and skill, will be highly dangerous to the persons or lives of one or more persons, known or unknown, the law, *ipso facto,* imposes as a public duty the obligation to exercise such care and skill. The law hedges round the lives and persons of men with much more care than it employs when guarding their property, so that, in this particular, it makes, in a way, every one his brother's keeper, and, therefore, it may well be doubted, whether in any supposable case redress should be withheld from an innocent person who has sustained immediate damage by the neglect of another in doing an act which, if carelessly done, threatens, in a high degree, one or more persons with death or great bodily harm." *Van Winkle,* 247.

Several principles are readily apparent from the *Van Winkle* holding: (1) That an inspection clause in an insurance contract creates a contractual right of action for the insured if there is a negligent inspection of the insured object. Implicit in this is the fundamental notion that inspections inure to the benefit of both the insurer and the insured. (2) A non-party to the contract has a cause of action against the insurer which is negligent in performing its inspections not upon principles of contract law but rather tort law, *i.e.,* a party who voluntarily assumes an undertaking owes a duty to all foreseeable plaintiffs to perform its undertaking with reasonable care.

The holding and reasoning of the *Van Winkle* case set a trend for the cases that followed. In *Hartford Steam Boiler Inspection & Ins Co v Pabst Brewing Co,* 201 F 617 (CA 7, 1912), an insurer was charged with the negligent inspection of the insured's steam boiler which had exploded and caused severe damage.

As in *Van Winkle,* the Seventh Circuit Court of Appeals applied tort principles rather than contract principles to the relationship between the insurer and the insured. The *Pabst* court recognized that the duty to use due care arises separate from the insurance contract, without regard to any contract obligation to inspect. Under the facts of the case, the duty arose from a number of factors, including: a long insurance relationship between plaintiff employer and defendant insurer, which had always been attended by periodic inspections by the insurer with reports issued to the employer describing conditions found; the insurance company's representative had inspected the boiler which exploded prior to that boiler's installation and continuously thereafter; and finally, advertise-

ments which had accompanied the insurance company's safety reports specifically emphasized the value of the inspection services.

Further, the *Pabst* case added a new element to the analysis of negligent inspection cases. The court required that for a cause of action to exist the claiming party must have *relied* on the inspections. It should be noted that this element of reliance became codified in Restatement of Torts, 2d, § 324A(c). Later courts, however, were to hold that in a negligent inspection action reliance need not be shown or reliance could be an alternative basis for determining liability under § 324A.[3]

Perhaps the leading modern case in the area of negligent inspection is *Nelson v Union Wire Rope Corp*, 31 Ill 2d 69; 199 NE2d 769 (1964). In *Nelson*, 18 plaintiffs brought suit for personal injuries and wrongful deaths against American Mutual Liability Insurance Company, the workers' compensation and public liability carrier for the general contractor on the construction project where plaintiffs worked. The substance of plaintiffs' complaint against American Mutual was that the insurer had gratuitously undertaken to make safety inspections of the practices and equipment of the insured general contractor and had carelessly and negligently performed these inspections, with the proximate result that workers were injured and killed. In response to plaintiffs' complaint, defendant insurer replied that what inspections it had performed were not gratuitously performed for the benefit of the employees of the insured, but rather were done exclusively for purposes of risk assessment.

---

[3] See, *e.g.*, *Nelson v Union Wire Rope Corp*, 31 Ill 2d 69; 199 NE2d 769 (1964); *Olkowski v Aetna Casualty & Surety Co*, 53 Mich App 497; 220 NW2d 97 (1974), *aff'd* 393 Mich 758; 223 NW2d 296 (1974).

In rejecting defendant's risk-assessment argument, the court found that plaintiff had properly stated a cause of action under the Restatement of Torts. The *Nelson* court held:

"Taken in its entirety, all of this evidence leads solely to the conclusion that defendant did gratuitously undertake to make safety inspections and to render safety engineering services on the courthouse project, and that such inspections were planned, periodic and directed to the safety of the employees on the project." *Nelson,* 83.

The evidence referred to included: regular and periodic inspections by the defendant, with reports and recommendations to the insured, and representations by the insurer that the insured would receive extra safety benefits from the services of defendant's safety experts.

In reaching its conclusion, the court also emphasized that defendant's lack of "control" over the activities or equipment of the insured or its employees did not relieve it of liability. See also *Andrews v Ins Co of North America,* 60 Mich App 190; 230 NW2d 371 (1975).

Confronted with an argument based upon the *Pabst* case that reliance either by the insured or its employees was a necessary part of any negligent inspection case, the *Nelson* court determined that in an action predicated upon the Restatement of Torts, reliance was not an essential element. The court reasoned:

"We think it clear under the law that defendant's liability for the negligent performance of its undertaking, as distinguished from a failure to perform, is not limited to such persons as might have relied upon it to act but extends instead to such persons as defendant could reasonably have foreseen would be endangered as the result of negligent performance. *It is axiomatic that*

*every person owes to all others a duty to exercise
ordinary care to guard against injury which naturally
flows as a reasonably probable and foreseeable conse-
quence of his act, and that such duty does not depend
upon contract, privity of interest or the proximity of
relationship, but extends to remote and unknown per-
sons."* (Emphasis added.) *Nelson, supra,* 86.

Inherent in the *Nelson* court's analysis of the
reliance question is also the rejection of an argu-
ment by defendant that there was no showing that
defendant's alleged negligent actions were the
proximate cause of plaintiffs' injuries. The court
found that the actions of the insurer in not in-
specting the faulty equipment constituted misfea-
sance. Had the equipment been properly inspected
and an appropriate warning given, it is highly
unlikely that injury would have resulted. Since
plaintiffs were found to be foreseeable persons, *i.e.,*
in the orbit of risk created by the negligent actions
of defendant, plaintiffs had properly pleaded a
cause of action under the Restatement.

The cases following *Nelson* were essentially vari-
ations on the same theme.[4] Yet because each case

[4] The majority of courts in actions brought against workers' com-
pensation carriers for negligent inspection have reached a result
similar to that of the *Nelson* court. See *Mays v Liberty Mutual Ins
Co,* 323 F2d 174 (CA 3, 1963); *Corson v Liberty Mutual Ins Co,* 110
NH 210; 265 A2d 315 (1970); *Fabricius v Montgomery Elevator Co,*
254 Iowa 1319; 121 NW2d 361 (1963); *Smith v American Employers'
Ins Co,* 102 NH 530; 163 A2d 564 (1960). See also *Sims v American
Casualty Co,* 131 Ga App 461; 206 SE2d 121 (1974), *aff'd per curiam
sub nom Providence Washington Ins Co v Sims,* 232 Ga 787; 209 SE2d
61 (1974); *Ray v Transamerica Ins Co,* 10 Mich App 55; 158 NW2d 786
(1968), *lv den* 381 Mich 766 (1968).

A case reaching a contrary result is *Viducich v Greater New York
Mutual Ins Co,* 80 NJ Super 15; 192 A2d 596 (1963). *Viducich* is
distinguishable, however, on its facts. In that case, defendant insurer
had conducted only one inspection of the machinery which caused
injury to plaintiff. In all the other cited cases the insurer had
conducted a series of inspections of its insured's property.

Other courts have reached a result similar to *Viducich* based not on
the facts of the case but upon interpretation of the language of the

presented a unique factual pattern, it became evident that courts and juries were evaluating the totality of the circumstances and stressing different factors in different cases in determining whether insurance companies would be held liable for negligent inspections.

In *American Mutual Liability Ins Co v St Paul Fire & Marine Ins Co,* 48 Wis 2d 305; 179 NW2d 864 (1970), the Wisconsin Supreme Court sustained a negligent inspection action by a workers' compensation insurance carrier against a liability insurance carrier which had insured a boiler. The court included in its discussion an evaluation of whether it was essential to a cause of action for negligent inspection that the insurer in securing the policy had emphasized the increased likelihood of safety promotion by the insurer's inspections. The court found that the statements made in advertisements by the insurer were not probative, saying:

"While some cases have placed stress upon the fact that the advertising of the insurance company in securing the policy emphasized the increased safety factor that would result from its inspections, we conclude that

workers' compensation statute. See 2A Larson, Workmen's Compensation Law, § 72.90.

In some states, including Michigan, the Legislature has in effect overruled court decisions and abrogated the common-law tort remedy against the workers' compensation carrier by amendments extending the immunity of the employer to these insurers. See 1972 PA 285, amending MCL 418.131; MSA 17.237(131) and MCL 418.827; MSA 17.237(827). See also, Ala Code § 25-5-11; Fla Stat Ann § 440.11(2); NH Rev Stat Ann § 281:2(II); Pa Stat Ann, title 77, § 501. The *ratio decidendi* of the court decisions, however, remains relevant with respect to the actions of other types of insurance companies. See *Sims v American Casualty Co,* 131 Ga App 461; 206 SE2d 121 (1974), *aff'd per curiam sub nom Providence Washington Ins Co v Sims,* 232 Ga 787; 209 SE2d 61 (1974). The legislative actions affected only the question whether a specific type of defendant could be held liable at all; it did not undercut the analysis and development of the common-law principles embodied in § 324A.

such 'puffing' expressed at the time the policy is taken out is not probative of the question of misfeasance. Although advertising of this nature would constitute a clear holding out of the intention to perform inspections, it is enough under * * * the Restatement rule that there be an actual undertaking to perform the inspection whether or not inspections were a promised inducement for the contract." *American Mutual,* 315.

Further, the court concluded that it was unnecessary to consider the question of contractual liability since a cause of action was made out in tort, under § 324A:

"Under this view it is immaterial in a negligence action whether or not the defendant contractually obligated itself to inspect the boilers. It is enough that it undertook to inspect the boilers and that it did so negligently." *American Mutual,* 313.

In *United States Fidelity & Guaranty Co v Jones,* 356 So 2d 596 (Ala, 1977), the court noted that decisions emphasizing the fact that an employer had its own safety personnel and held safety meetings in determining that the insurer could not have undertaken to assist the employer in its duty to provide a safe workplace erroneously ignored the possibility that both parties, the insurer and the employer, might be jointly liable.

Other courts began to acknowledge that inspections should not be viewed in terms of benefits for the insurer alone. Any improvement of safety lowered the insurer's possibility of loss and thus was of benefit to the insured or any other reasonably foreseeable plaintiff. *Sims v American Casualty Co,* 131 Ga App 461; 206 SE2d 121 (1974), *aff'd per curiam sub nom Providence Washington Ins Co v Sims,* 232 Ga 787; 209 SE2d 61 (1974).

*Beury v Hicks,* 227 Pa Super 476; 323 A2d 788

(1974), differs from the prior cases in that it was not an action against an insurance company. In *Beury,* a wrongful death action was brought against certain property owners and a power company. Plaintiff's decedent was killed when a tree limb fell upon his automobile. Plaintiff's action against the property owners and the power company, which inspected and maintained services on trees adjoining the highway in proximity to the company's power lines, was based upon negligent inspection.

The Pennsylvania Superior Court dismissed the action as against the property owners but found for plaintiff as against the power company. Resting its decision on § 324A and finding that the question of whether the power company's actions constituted a gratuitous undertaking on behalf of foreseeable third parties was submissible to the jury, the *Beury* court forcefully concluded:

> "Liability under § 324A does not require, as appellant argues, the express undertaking of a duty owed by the landowners to third parties. *Rather, the Section applies to any undertaking to render services to another which the gratuitous actor should recognize as necessary for the protection of third parties.* Thus, the fact that appellant performed tree care services for the protection of its transmission lines does not preclude liability. Whether the services should have also been recognized as necessary for the protection of third parties was an issue properly submitted to the jury and resolved in the appellee's favor." *Beury, supra,* 480.

Finally, the Michigan courts have not been totally silent in the area of causes of action for negligent inspection. As has been alluded to, the Michigan Court of Appeals in *Ray v Transamerica Ins Co,* 10 Mich App 55; 158 NW2d 786 (1968), *lv den* 381 Mich 766 (1968), found that the immunity

enjoyed by an employer from suits by its employees did not extend to the workers' compensation carrier of the employer. A direct action by the employee against the carrier for allegedly negligent inspection could be made.[5]

When the *Ray* case reached the Court of Appeals again in *Ray v Transamerica Ins Co*, 46 Mich App 647, 653; 208 NW2d 610 (1973), the Court made a poignant statement regarding the public policy question involved in allowing actions against insurance companies for negligent inspection:

"Much is made of the economic argument that if insurers are subjected to unlimited liability for faulty inspection, they will cease all inspection to the detriment of workers, employers, and the public. We find this argument unpersuasive * * *. A recent case in the Sixth Circuit Court of Appeals said:

" 'Just as insurance carriers are voluntarily induced into insuring workmen's compensation risks by the premiums they charge, so also do these carriers voluntarily engage in safety inspections to enhance their economic returns from their insurance coverage. Promises to make safety inspections are not taken because there is a workmen's compensation law, but are made to reduce industrial accidents and enhance carrier profits.' *Bryant v Old Republic Ins Co*, 431 F2d 1385, 1388 (CA 6, 1970)."

II

Restatement § 324A recognizes that the common-law tort principles of negligent inspection in

[5] As noted, the Legislature subsequently extended the tort immunity enjoyed by employers to workers' compensation carriers.

It has been specifically held that, in the absence of legislative action, such immunity does not extend to property insurers. *Staffney v Fireman's Fund Ins Co*, 91 Mich App 745; 284 NW2d 277 (1979).

three-party situations require a plaintiff, in order to maintain such a cause of action, to show existence of the following four elements of the tort:

(1) the existence of a *duty* to use due care running from the party sought to be held liable to the plaintiff seeking recovery. The pertinent language of § 324A describes this duty as follows: "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person". Set in the context of the instant cases, the relevant inquiry is whether there is evidence in the record that the insurers undertook to render to the employers of the present plaintiffs or their decedents fire safety inspections which the insurers should have recognized as necessary for the protection of the insureds' employees;

(2) that the party sought to be held liable *breached* its duty through negligent conduct. The Restatement expresses this element by requiring the party who has undertaken to render the services to have "fail[ed] to exercise reasonable care to protect *[sic;* perform] his undertaking". Under the facts of the cases, then, the question becomes whether the insurers did or did not exercise reasonable care in carrying out their fire safety inspections.

(3) that the negligence of the party sought to be held liable *proximately caused* the plaintiff's injuries or death. The Restatement encompasses this element by requiring that the physical harm to the third person "result" from such party's failure to exercise reasonable care. In the instant cases, the question for this Court, then, is whether, after establishing that the insurers failed to exercise

reasonable care in performing their undertaking of rendering fire safety inspections, plaintiffs can show that such failure of reasonable care was the proximate or legal cause of the injuries or deaths for which recovery is sought.

(4) that *injury* has in fact occurred to the employees, *i.e.,* the Restatement's requirement of "physical harm". In short, the plaintiff employees or their decedents must suffer physical injury as a result of the concurrence of the first three elements. This fourth element is not disputed in the instant cases.

In addition to these four elements of the cause of action, Restatement § 324A lists three circumstances, stated in subparagraphs (a)-(c),[6] any one of which must also be present to impose liability under that section. The question common to both *Smith* and *Sabraw* involves the circumstance embodied in subparagraph (b), *i.e.,* the party sought to be held liable has undertaken to perform a duty owed by another to a third person. Under the facts of the instant cases, the requirement of this subparagraph subsumes the threshold element of duty set out in the prefatory paragraph of § 324A and explicates it. In other words, to show that, as stated in (b), the insurers herein undertook to perform the duty owed in the first instance by the employers to provide a safe workplace for their employees, *e.g.,* one free from fire hazards, is also necessarily to show that the insurers undertook to render services to the employers which the insurers should recognize as necessary for the protection of a third person as required in the first clause of § 324A.

Our job in the present cases, as noted in Part III, *infra,* is to ascertain whether the verdicts for

___

[6] See p 748, *ante.*

the plaintiffs were supported by the evidence. More specifically, there must exist evidence to support each of the four necessary elements of the tort set forth above.

As our colleagues note, often the most difficult problem in this regard is finding evidential support for the duty element. However, even the majority recognizes that liability for negligence to foreseeable third persons may be imposed without an express undertaking between two parties to render services. The conduct of the parties may also evidence an undertaking by the insurer to render services to another with its inspection, thus giving rise to a duty on its part to exercise reasonable care in performing the inspection.

In the overwhelming majority of cases, there is no express agreement between the parties in this regard. Therefore, the courts, in passing upon the propriety of a jury's verdict imposing liability as well as in determining whether to submit the case to the jury, of necessity are forced to look to the actions of the parties for guidance with respect to not only the duty element, but also the other elements of § 324A and the common-law tort as well. A careful review of the long line of negligent inspection cases discussed in Part I, *supra,* reveals that the courts have looked to a number of different evidentiary factors to determine whether a plaintiff has adequately proved the critical legal elements of duty, breach, proximate cause and injury. It is important in this respect to recognize that each case has a unique factual pattern and therefore the *totality of evidence presented rather* than any particular fact is crucial in evaluating the existence of these four elements of the tort. Further, different courts stress different factors in establishing the tort. Nevertheless, certain eviden-

tiary factors have been of noticeable importance to the courts in deciding issues similar to those raised in the instant cases.

Without intending to make an exhaustive list of such evidentiary factors or to immutably limit the scope of inquiry under each factor, we offer the following as illustrative of the proper focus of attention:

(1) *The amount of inspecting done.* One of the most essential elements in proving the existence of a duty is to show that there was an undertaking to render services to another. Consequently it is important that a series of inspections must have been conducted. No court has allowed a finding of liability when an insurer who had such a right failed to inspect. *Mann v Highland Ins Co,* 461 F2d 541 (CA 5, 1972). Some type of inspection is required to convert the right to a duty.

In addition, if the action is predicated upon § 324A(b), *i.e.,* the insurer has undertaken to perform a duty owed by the insured to a third person, there must be a showing of some kind of communication between the insurer and insured regarding the inspection and the findings made. It is unlikely that a cause of action would obtain under (b) if there was absolutely no release of information regarding the inspections by the insurer to the insured. See, *e.g., Viducich v Greater New York Mutual Ins Co,* 80 NJ Super 15; 192 A2d 596 (1963).

(2) *The purpose of the inspection.* This factor also encompasses consideration of the duty element, especially as reflected in the introductory, threshold language of § 324A, *i.e.,* "[o]ne who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person".

Our colleagues conclude that an insurer, in performing safety inspections, cannot be charged with an undertaking unless it specifically agreed or intended to benefit the insured or the insured's employees. They further state that § 324A liability cannot be applied to an actor who follows a "self-serving course of conduct".[7]

Along the same lines, defendant insurers routinely raise this defense, contending that their activities are totally or even primarily self-serving, *e.g.,* for risk-assessment purposes, and that they were never intended to benefit the assured. However, many courts have rejected this argument for a number of reasons. The emphasis upon defendants' intent and assumed obligation in imposing a duty is inconsistent with the conceptual underpinnings of tort law, which, for reasons of policy, often imposes a duty without regard to a defendant's intent.

Further, the courts recognize that the fact that the primary purpose of the insurer's acts is for its own benefit does not preclude a finding that the acts *also* constitute an undertaking within the meaning of § 324A with the consequent duty, running to third parties, to use due care in the performance of those acts. Certainly inspections may serve a dual purpose. The same acts which benefit the insurer and reduce its possibility of loss also benefit the insured and the insured's employees by providing a safer workplace. *Sims v American Casualty Co,* 131 Ga App 461; 206 SE2d 121 (1974), *aff'd per curiam sub nom Providence Washington Ins Co v Sims,* 232 Ga 787; 209 SE2d 61 (1974). To allow an insurer to escape liability merely because its actions have a self-serving component is to totally disregard the benefit or tragedy that can

---

[7] Opinion of Justice LEVIN, p 717.

result from the insurer's activities. See *Beury v Hicks,* 227 Pa Super 476; 323 A2d 788 (1974). By such a standard, long-standing principled advances in tort law and concepts of social justice would be undermined.

Certainly the courts do consider the purpose of the inspection in evaluating the nature of defendant's undertaking and duty. If the inspection is found to be *solely* for internal insurance purposes, a duty is less likely to be found. However, the purpose is measured not by the insurer's stated intent, but by the insurer's conduct, its relationship to the other parties involved, and also by the conduct of those parties. Some circumstances, such as advertising by the insurance company which emphasizes that increased safety will result from the purchase of insurance, are regarded as a clear indication that the purpose of the inspection is to benefit the insured. *Nelson, supra.* However, courts will find an undertaking even in the absence of this type of representation. *American Mutual Liability Ins Co v St Paul Fire & Marine Ins Co,* 48 Wis 2d 305; 179 NW2d 864 (1970).

Most often, though, the conduct of the insurer is equivocal, *i.e.,* consistent with inspections for the purpose of internal use only as well as for the insured's benefit. In that case, as discussed in Part III, *infra,* determination of whether or not the inspections were conducted in any sense for the benefit of the insured, and whether such conduct constitutes an undertaking within the meaning of § 324A so that a duty is properly imposed on the insurer must be left to the jury.

(3) *The class of persons to which the injured person belongs.* The person injured must be a member of the class which the inspection was intended to protect. Generally, when inspection

services are performed for an employer, and the insured's employee is the injured party, this aspect of duty causes little difficulty because in most cases the insurer should have recognized these services "as necessary for the protection of a third person or his things".

(4) *The scope of inspection.* In order to satisfy the requirement of proximate causation and hold the insurer liable for its failure to inspect or detect an injury-causing defect, such a defect must be within the scope of the undertaking the insurer contracted for. For example, a fire insurer will not be held liable for the failure to inspect or detect that a machine did not have proper safety guards unless the lack of such guards in some way posed a fire hazard. To predicate liability, the scope of the inspection should be reasonably related to the precipitating cause of the injury. In other words, under traditional considerations of proximate causation, liability is limited not by what is injured, but by how the injury occurred.

In addition, it should be emphasized that the inquiry regarding the scope of the inspection includes not just whether the insurer inspected the exact cause of the injury; it includes also a consideration of whether, given the insurer's undertaking, it *should have* inspected the exact cause of the injury.

(5) *Control over inspections and repairs.* A problematic component of the issue of causation in negligent inspection cases involves the extent to which the negligence of the insurer in conducting inspections caused the plaintiff's harm. If the insurer has control over the inspection and any repairs that necessarily result from the inspection, the insurer will be liable if the insurer either fails to properly inspect or fails to properly make the

repairs. Such a situation assumes that the insurer has totally assumed the duty of the insured in this regard. However, the insurance company need not have complete control in ordering repairs to be charged with a duty to the employees and to be found to have proximately caused injury or death. *Nelson, supra; Andrews v Ins Co of North America,* 60 Mich App 190; 230 NW2d 371 (1975). As is usually the case, the insurer does not have full control but merely participates in the activity by making recommendations for repairs. In these cases, if in the normal course of things the insured generally follows the recommendations of the insurer, a question for the jury arises as to whether the insurer has in fact assumed the duty of the insured and by its activities or omissions may be said to have legally caused plaintiff's injuries.

(6) *Reliance.* While some of the earlier cases required a showing of reliance on the part of the insured or its employees, the modern view based on § 324A is that the rule is stated in the disjunctive and that there need be no showing of reliance as to the theory of recovery under subparagraph (a) or subparagraph (b) of the Restatement. *Olkowski v Aetna Casualty & Surety Co,* 53 Mich App 497; 220 NW2d 97 (1974), *aff'd* 393 Mich 758; 223 NW2d 296 (1974).

## III

The instant cases must be analyzed not only in terms of the substantive principles emerging from prior cases, but also taking into account the procedural posture in which they come to this Court.

In both *Smith* and *Sabraw* the jury returned a verdict in favor of plaintiffs. Nevertheless, in both cases the trial judge granted defendants' motion for judgment notwithstanding the verdict.

There are two interlocking aspects of appellate review of a jury's verdict. First, and particularly important with respect to the instant cases, a reviewing court must determine whether the particular issue is an appropriate one for the jury's consideration at all, based upon the proper division of functions between the court and the jury.

The threshold question in these cases, as in many other negligence cases, is whether defendants owed any duty of care to plaintiffs. We agree that, as a general proposition, the question of duty is for the court to decide. See *Moning v Alfono,* 400 Mich 425; 254 NW2d 759 (1977). However, often the imposition of a duty in the first instance depends on factual circumstances establishing the conduct or relationship of the parties involved. The existence or nonexistence of such facts, as well as the resolution of disputed inferences therefrom, are clearly questions for the jury's determination. *Farwell v Keaton,* 396 Mich 281; 240 NW2d 217 (1976); *Elbert v Saginaw,* 363 Mich 463; 109 NW2d 879 (1961).

The Court's discussion of the issue of duty in *Farwell* provides a framework that is useful in analyzing the question in the instant cases. In *Farwell,* decedent was severely beaten in a parking lot outside a restaurant while his companion, defendant Siegrist, escaped injury. Decedent was given an ice pack to apply to his head. Subsequently, Siegrist drove decedent around, stopping at four different drive-in restaurants. During that time, decedent fell asleep in the back seat of the car. After approximately two hours, Siegrist ended up at decedent's grandparents' house, parked the car in the driveway, unsuccessfully attempted to wake decedent and left. Decedent was found alive in the car the next morning, but died three days later.

After discussing the functions of the court and jury with respect to the question of duty, this Court concluded:

"In a case such as the one at bar, the jury must determine, after considering all the evidence, whether the defendant attempted to aid the victim. If he did, a duty arose which required defendant to act as a reasonable person." *Farwell,* 287-288.

The situation in negligent inspection cases is directly analogous to that in *Farwell.* In both circumstances, defendant's conduct is examined for the presence of certain factors which, if found, give rise as a *matter of law* to a duty to act with reasonable care.

In *Farwell,* an initial element that had to be found before a duty could be imposed was an *attempt to aid the victim;* similarly, in negligent inspection cases under § 324A, an initial element that must be found before a duty arises is *an undertaking to render services to another.* And, just as in *Farwell,* where the existence of this basic element is a factual determination for the jury, under § 324A, the question whether defendant actually undertook to render services to another is a factual one that the jury must answer after considering all the evidence and drawing reasonable inferences therefrom.

However, my colleagues decide that, under the facts of the instant cases, *as a matter of law* defendant fire insurers did not undertake to render inspection services for the employers. They summarily conclude that where the evidence of defendants' undertaking is equivocal, *i.e.,* consistent with a purpose to benefit another as well as himself, "the plaintiff must offer additional evidence to create a question for the jury whether

there was an undertaking to render services and hence a duty".[8]

Yet, as noted above, the basic question of the existence of an undertaking is a factual one. It is one thing when there is no evidence at all of defendant's undertaking, *e.g.*, where defendant does not perform any inspections at all. In that situation, of course, the court may decide the issue as a matter of law. It is a completely different matter when evidence of the undertaking exists, but is equivocal, as when the character or purpose of the inspections is unclear. Then the issues of fact, and reasonable inferences including the resolution of any ambiguities, all must be submitted to and determined by the jury.

Removal of the undertaking question from the jury's consideration in the instant cases not only contravenes theoretical concepts of the division of function between judge and jury but also conflicts with the way Michigan courts have consistently approached these functions in negligent inspection cases. For example, in *Ray v Transamerica Ins Co,* the Court stated:

"Normally the issue of duty owed a particular person is a question for the trial court. * * * However, where, as here, the existence of a relationship between the parties determines the duty owed, and that relationship is not clear, the issue of duty may be properly given to the jury." 46 Mich App 647, 654.

Specifically, whether the insurance company undertook to provide safety inspection services on the insured's premises, the frequency of the inspections and their character are all "factual issues for jury resolution". *Megge v Lumbermens Mutual Casualty Co,* 45 Mich App 119, 122; 206 NW2d 245

[8] Opinion of Justice Levin, p 718.

(1973). Finally, "[t]he jury is given wide latitude in evaluating the undertaking of the insurance company". *Andrews, supra,* 199.[9]

For the foregoing reasons, the question whether defendant insurers undertook to render services to another in the instant cases should not be decided as a matter of law by this Court. Rather, it was properly submitted to the jury. In both *Smith* and *Sabraw* the jury found that defendants' conduct did constitute an undertaking giving rise to a duty to use reasonable care.

The second aspect of appellate review of a jury's verdict is that a court will refuse to disturb such a finding of fact or the verdict as a whole unless reasonable minds could not differ regarding the finding or verdict. *Megge, supra.* Further, all evidence presented, findings of fact and legitimate inferences drawn therefrom are to be construed in favor of the non-moving party, the plaintiffs in the instant cases. *McKinney v Anderson,* 373 Mich 414; 129 NW2d 851 (1964). Analysis of the facts as presented in Part IV, *infra,* clearly indicates that the jury's verdicts in both *Smith* and *Sabraw* easily pass this test.

## IV

Using this substantive and procedural background as a framework for analysis, we turn our focus to the application of § 324A(b) to the present cases and the issues raised in these cases to ascertain whether a sustainable action for negligent inspection has been raised by the facts of the cases.

---

[9] The analysis of duty and the division of function between judge and jury under § 324A as presented in these cases is not affected by the subsequent legislative grant of tort immunity to workers' compensation insurers.

*Smith*

We begin by noting that plaintiffs' cause of action was based solely on § 324A(b) of the Restatement of Torts, *i.e.,* "he has undertaken to perform a duty owed by the other to the third person". Since the question of reliance was not raised nor need be raised if plaintiffs have successfully pleaded a cause of action under § 324A(b), *Olkowski, supra,* we do not address the question of reliance.

In considering all the relevant evidence, we feel the jury was justified in finding that Allendale, through its agent Factory Mutual, undertook to perform the duty of Great Lakes Steel to provide a safe workplace for its employees. The evidence presented also justified submission of the duty question to the jury. There was uncontroverted testimony that Factory Mutual had conducted inspections of the Great Lakes Steel facility for over 40 years. Further, Factory Mutual held itself out to be one of the most pre-eminent companies in the world in terms of fire inspection and protection. While it did not make any repairs at the Great Lakes facility, after conducting an inspection it would hold an "exit interview" with the fire chief, plant manager and chief engineer and make its recommendations and ask for action. Although defendant Factory Mutual argued that such inspections as a whole were purely for risk-assessment purposes, there was evidence on the record as a whole which rebutted that contention. Defendant Factory Mutual was clearly aware that Great Lakes relied on the inspections made by defendant. In addition, evidence reflected that the recommendations made not only provided a benefit to the insured, but also provided a benefit to the employees of the insured as well. A proper inspec-

tion of property for fire hazards will most likely have the concomitant benefit of providing a safer work environment for employees. Based on all this evidence, we conclude that plaintiffs properly established the duty element of the tort.

There was also sufficient evidence to uphold the jury's verdict that the insurer failed to exercise reasonable care in its inspections and that such failure proximately caused plaintiff's injuries. While defendant Factory Mutual argued that the "scope" of its inspections did not extend to the ungrounded electrical system, evidence was adduced to support the question for the jury that the inspection "should have" extended to the electrical system. Factory Mutual's engineer-inspectors were specifically trained to find fire hazards. Additionally, they were trained to inspect for violations of the National Electrical Code. Plaintiffs' expert testified that the non-limited electrical system posed a major fire hazard for the whole Great Lakes facility and such non-limited system was in direct violation of the National Electrical Code. Further, even witnesses for Factory Mutual acknowledged that one in five industrial fires results because of some fire in the electrical system. Yet, these same witnesses acknowledged that the vast electrical system was never at any time inspected.

Combined with this evidence of defendant's negligence in inspecting is the fact that even though Great Lakes Steel had its own "safety" department, it consistently complied with and made changes based upon the recommendations made by Factory Mutual. Thus there was no reason to believe that if Factory Mutual had exercised reasonable care by inspecting the underground electrical system and discovering its hazardous, non-limited nature, Great Lakes Steel would not have

complied with any suggested safety recommenda-
tions. Great Lakes Steel recognized Factory Mu-
tual to be an expert in terms of fire protection and
for this reason complied when Factory Mutual
dictated that some action be taken. Under the
standards established for consideration of proxi-
mate causation, a proper question submissible to
the jury was raised as to whether an inspection
conducted with reasonable care would have pro-
tected the plaintiff.

Defendants did not challenge the existence of
the element of injury to plaintiff.

*Sabraw*

We note at the outset that plaintiffs pleaded
their cause of action under subparagraphs (a), (b),
and (c) of § 324A of the Restatement. Because of
our conclusions regarding subparagraph (b), we
need not decide whether plaintiffs have success-
fully pleaded a cause of action under subpara-
graphs (a) and (c).[10]

As in *Smith,* we find that the evidence, taken as
a whole, supports the jury's determination that
the duty requirement of § 324A was satisfied. De-
fendant Michigan Millers' involvement in the ac-
tivities of its insured began prior to the existence
of an insurance contract on the premises. Michi-

---

[10] Additional support for the jury's verdict for plaintiffs is provided
by application of Restatement § 324A(c) to the facts of this case.
Plaintiffs have made out a strong case that both the management and
employees relied on the inspections made by Vaughan for their
safety. Mr. Euler, the assistant manager of the mill, stated that he
thought that the inspections were provided to promote a safe working
environment for Farm Bureau employees and he relied on them to
accomplish this purpose. There was evidence that the inspections
upon which plaintiff relied, because of the negligent manner in which
they were conducted, led directly to the harm plaintiffs suffered.
Further, while there was evidence that Farm Bureau did have a
safety committee of sorts, the operation was a mere token operation.
Evidence was presented from which the jury could conclude that
Farm Bureau depended for the most part upon the actions of Vau-
ghan and Michigan Millers in inspecting its premises.

gan Millers' inspector, Mr. Vaughan, was inti-
mately involved in the very construction of the
Zilwaukee mill. Vaughan made recommendations
regarding the installation of electrical equipment
and insisted that the insured comply with certain
safety standards dealing with fire and explosion
protection. After the buildings were completed,
Vaughan continued to make inspections of the
facilities. While he did not make actual repairs to
the facilities, Vaughan would make recommenda-
tions for changes that he felt essential for the
protection of the property and for the safety of the
employees as well. Sometimes his recommenda-
tions were made verbally to plant management or
employees and in other cases his recommendations
were included in his written reports, copies of
which were always supplied to the insured. Fur-
ther, Vaughan would supply safety literature and
directly counsel employees regarding safety con-
cerns. Finally, the insured most often complied
with the recommendations of Michigan Millers.

Again as in the *Smith* case, defendant attempted
to avoid the imposition of a duty by arguing that
the purpose of its inspections was merely for risk
assessment. Such argument, however, was contro-
verted by the statements and actions of defen-
dant's agent Vaughan. A question for the jury was
presented. Vaughan testified that his inspections
were not merely for rate-making purposes. He
stated that his inspections accomplished a dual
purpose: to prevent fire and explosion and to safe-
guard employees by preventing fire and explosion.
As has been noted, on several occasions Vaughan
characterized the purpose of his inspections as
being to minimize danger of loss or *injury* and his
recommendations were made to promote fire safety
and *employees'* health. Furthermore, as above

noted, Vaughan reported to Farm Bureau and even counseled Farm Bureau employees regarding fire safety. Given the totality of this evidence, the jury could have found an undertaking under § 324A in spite of a clause on Vaughan's post-inspection fire prevention forms which attempted to limit Michigan Millers' liability for negligent inspection.

As to whether the defendant was negligent in failing to warn Farm Bureau of the fire danger that the operation of the gasoline-powered Bobcat within the mill presented, defendant argued that the scope of its inspection did not even extend to the Bobcat vehicle. Vaughan himself testified that although he knew a Bobcat was used on the premises he never saw the Bobcat being operated in the mill itself. He did acknowledge, however, that there was a considerable risk to having a gasoline-engine vehicle being operated within a mill. Employees, on the other hand, testified that the Bobcat was regularly used in the mill and that if Vaughan was not directly aware of such use, from all the circumstances he should have been aware of such use. The courts below correctly determined that the question whether defendant knew or should have known of the use of the dangerous instrument known as the Bobcat was one for the jury to decide.

The question of cause in fact and proximate cause is a close one in this case. While there was testimony that Farm Bureau most often complied with the recommendations made by Michigan Millers, there was also testimony that on at least one occasion involving a very important matter, Farm Bureau failed to comply with the recommendations of Michigan Millers. Vaughan testified that from the very beginning of the construction of the project he had recommended that some kind of

dust-control system be installed. No dust-control system was installed. The lack of dust control, defendants contend, could have contributed to the explosion caused by the Bobcat. Although there is support for defendants' argument, on balance there is sufficient evidence from which a jury could conclude that there was a substantial likelihood that Farm Bureau would have ceased the use of the Bobcat within the mill had the risk of such use ever been reported to Farm Bureau. More significantly, evidence exists from which the jury also could have concluded that defendant's negligence in failing to discover and warn of the dangers of using the Bobcat was a sufficient factor in causing plaintiffs' harm.

Once more, as in *Smith,* there is no question of plaintiffs' injuries.

From the above, there can be no question that there was evidence to support the jury's findings in both *Smith* and *Sabraw* that defendants, under the common law and 2 Restatement of Torts, 2d, § 324A, had gratuitously undertaken a duty to protect the employees of the insured from fire hazards and had breached that duty proximately causing injury and death to plaintiffs. We so hold.

# V

Having resolved the first issue in favor of plaintiffs, we determine that the second issue is basically a non-issue. Some courts have held that a party can limit its exposure to tort liability by express contractual limitations. See, *e.g., Jeffries v United States,* 477 F2d 52 (CA 9, 1973); *Roberson v United States,* 382 F2d 714 (CA 9, 1967). We need not address whether an attempt by a fire insurer to expressly limit its liability by contract is bind-

ing. In the absence of such express limitations by
contract, as in the present cases, an insurer which
has gratuitously undertaken to perform fire in-
spections and has performed them in a negligent
fashion cannot claim that the scope of its inspec-
tions was limited to property only because the
orbit of risk from fire hazards encompasses not
only all foreseeable property but also all foreseea-
ble persons.

## VI

We agree that decisions such as those in the
instant cases should not be made in the absence of
public-policy considerations. Defendant insurers
paint a gloomy picture of the consequences of
imposing liability in such circumstances. An ad-
verse decision, they argue, will either completely
discourage insurers from performing inspections or
require them to be so careful that the cost of
insurance will become prohibitively high.

With respect to the first contention, that insur-
ers will stop performing safety inspections, it is
speculative at best. As noted earlier, insurance
companies in a competitive market are motivated
to conduct inspections for their economic self-inter-
est, *i.e.,* to assess risks and reduce liability,
thereby enhancing profits. There is substantial
impetus to continue inspections for these purposes
even in the face of potential tort liability. Further,
a number of courts have concluded that no inspec-
tion at all is preferable to a negligent one. See,
*e.g., Fabricius v Montgomery Elevator Co,* 254
Iowa 1319; 121 NW2d 361 (1963). Besides, if insur-
ers' representations as to the limited nature of
their inspections are to be taken at face value,

their contribution to the overall safety of the workplace is certainly open to question.

Insurers' alternative prediction, that with the imposition of liability for negligent inspections the cost of insurance will increase dramatically, must be evaluated in the context of the fact that human lives are at stake. We are unwilling to adopt the position that requiring measures to save lives and avoid tragic injuries is not worth some potential increase in cost. Moreover, even a threatened overall rise in insurance costs is dubious. Over a period of time, as inspections become more careful, fewer accidents will occur, insurance companies' liabilities will decrease, and the cost of insurance will go down. Finally, the policy of tort law favors redressing people for their injuries rather than allowing tortfeasors to avoid the consequences of their wrongs.

Defendants also point to the Legislature's action in protecting workers' compensation carriers from tort liability for their performance or failure to perform safety inspections as representing implicit approval of the insurers' public-policy views. They argue that this Court should, therefore, find these same considerations of policy persuasive with respect to the property insurers in the instant case.

The succinct response to this contention is that the Legislature itself did not extend tort immunity to property insurers. Had the Legislature found that public policy dictated that property insurers receive protection from tort suits, it simply could have granted immunity to them as it did to workers' compensation carriers. *Staffney v Fireman's Fund Ins Co,* 91 Mich App 745; 284 NW2d 277 (1979). We decline to do what the Legislature would not do.

CONCLUSION

We conclude, therefore, that there was evidence to support the juries' findings that defendants had gratuitously undertaken a duty to protect the employees of the insured from fire hazards, within the meaning of 2 Restatement of Torts, 2d, § 324A, and had breached that duty, causing injury to plaintiffs. Accordingly, we would reverse the Court of Appeals in *Smith* and remand to the trial court for reinstatement of the jury's verdict. We would affirm the Court of Appeals in *Sabraw.*

Costs to plaintiffs.

WILLIAMS, J., concurred with BLAIR MOODY, JR., J.